Submitted November 7, 2014, reversed March 2, 2016

In the Matter of M. A.,
A Person Alleged to have a Mental Illness.
STATE OF OREGON,
*Respondent,*

*v.*

M. A.,
*Appellant.*

Multnomah County Circuit Court
140261784; A156435

371 P3d 495

Garrett A. Richardson and Multnomah Defenders, Inc., filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General and Judy C. Lucas, Senior Assistant Attorney General, filed the brief for respondent.

Before Duncan, Presiding Judge, and Lagesen, Judge, and Wilson, Senior Judge.

DUNCAN, P. J.

**DUNCAN, P. J.**

In this civil commitment case, appellant seeks reversal of the trial court's judgment, which committed him to the Oregon Health Authority, pursuant to ORS 426.130(1)(a)(C), on the ground that he suffered from a mental disorder that caused him to be a danger to himself and others and rendered him unable to provide for his basic personal needs. We reverse.

When reviewing a challenge to a civil commitment judgment, unless we exercise our discretion to review the matter *de novo*, "'we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome.'" *State v. R. L. W.*, 267 Or App 725, 728, 341 P3d 845 (2014) (quoting *Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P3d 444 (2013)). In this case, appellant has not asked us to review the matter *de novo*, and we decline to do so. *See* ORAP 5.40(8)(C) (providing that the court will exercise its discretion to review *de novo* "only in exceptional cases"). Consequently, we state the historical facts in accordance with the trial court's express and implicit findings because there is evidence in the record to support them, and we review the trial court's conclusion that the requirements for commitment were met to determine if it is supported by legally sufficient evidence.[1]

We begin with the facts. Appellant is a Saudi Arabian national and, while boarding an airplane in Portland, he got into a disagreement with a female flight attendant. Appellant demanded to speak to a male, and walked to the front of the plane to speak to the pilot. The pilot told appellant that his behavior was unacceptable and that he would not be allowed to continue on the flight. The pilot and appellant stepped into the jetway, and appellant tried to reenter the plane several times, but was blocked by

---

[1] Although some of the cases cited in this opinion were subject to *de novo* review, they guide our analysis because "our disposition in each instance ultimately derived from legal principles that apply and control regardless of the standard of appellate review pertaining to the predicate facts." *State v. B. B.*, 240 Or App 75, 84, 245 P3d 697 (2010).

the pilot, who had called law enforcement officers. When the officers arrived and arrested appellant, there was a physical altercation and appellant suffered a small rug burn on his face.

Two days after appellant was arrested, he was interviewed by Special Agent Kelley of the Federal Bureau of Investigation, who is a member of a Joint Terrorism Task Force and has had training on Arab cultures. Appellant described what had happened at the airport, including that the flight attendant had put her hands palm forward to his face, which, according to Kelley, is an "extraordinarily offensive gesture * * * to a young Saudi male[.]" Appellant could not understand why he was in custody; he told Kelley that he believed his brother was playing a joke on him. Based on appellant's statements during the interview, Kelley believed that appellant was "at the very genesis" of mental illness. Appellant remained in jail for more than a month after the airport incident.

Within four days of his release from jail, appellant went to a bank, where he spoke nonsensically to a teller and needed assistance using an ATM. He stared at bank customers and made them uncomfortable. A bank employee called the police, and the officers who responded asked appellant to leave the bank. Appellant did not leave, but he remained calm until the officers attempted to arrest him, at which point he resisted. The officers tackled him and transported him to jail.

Based on appellant's conduct at the bank, the state charged him with criminal trespass and resisting arrest, both misdemeanors. In jail, appellant was initially housed in "the hole," the highest disciplinary segregation unit, for a few weeks. He was then transferred to the jail's psychiatric infirmary.

While appellant was in jail after the bank incident, Kelley made arrangements for appellant to fly back to Saudi Arabia accompanied by a Saudi Arabian official. When Kelley attempted to take appellant from jail to a hospital for treatment so that he could return to Saudi Arabia, appellant refused to leave his jail cell because he believed that people outside the cell would kill him.

The state placed a civil commitment hold on appellant, and he was transferred to a hospital. At appellant's civil commitment hearing, Kelley testified that, when he visited appellant in jail after the bank incident, appellant had a difficult time maintaining a single line of thought and denied that he was even in jail. Kelley also testified that appellant appeared to have lost between 10 and 15 pounds since Kelley had interviewed him approximately two months earlier. Appellant told Kelley that he was not eating or drinking because voices were telling him that his food and water were poisoned. Appellant reported that he had not had any food or water for 15 days. Appellant believed that anywhere outside his cell was dangerous and that people wanted to kill him.

Kelley testified that appellant had been in the United States on a student visa but that immigration officials had revoked his visa. According to Kelley, appellant was in the country illegally and immigration officials were aware of his status.

A mental health consultant from the jail, Grooms, testified that she believed that appellant was mentally ill because he had delusions about, among other things, having lost large amounts of weight and having people in his cell. Regarding appellant's consumption of food and water in jail, Grooms testified:

> "I think the first few weeks of [appellant's] custody [after the bank incident], he was not eating regularly or well enough. He had a lot of diet concerns and I think that may be cultural, too. I know eventually they were able to get him whatever type of diet he had requested. And there's a lot of documentation * * * of his not eating for several days and then eating, like, a full meal, a sack lunch, drinking five cups of juice and having cookies."

According to Grooms, who had seen appellant when he was in custody after both the airport incident and the bank incident, appellant had not suffered any "notable weight loss" while in jail. Grooms testified that, if a person was in jail on misdemeanor charges and did not have any holds, the person probably would be in jail "[a] few days at most."

The trial court concluded that appellant "suffer[ed] from a mental disorder" and, as a result, was "dangerous to [him]self," "dangerous to others," and "unable to provide for basic personal needs and [was] not receiving such care as is necessary for health and safety." *See* ORS 426.130(1)(a)(C); *former* ORS 426.005(1)(e)(A), (B) (2014), *renumbered as* ORS 426.005(1)(f)(A), (B) (2015). Regarding appellant's dangerousness, the trial court reasoned that, because appellant was unable to accurately interpret others' actions and control his own responses, he might overreact to others and "either he or somebody in the community would get hurt." Regarding appellant's ability to provide for his basic needs, the trial court found that appellant would remain in jail on his pending misdemeanor charges only for "a relatively short period of time" and that, when released, he would not be able to meet his basic needs because he was unable to make or follow through with "any plan."

On appeal, appellant does not dispute that the state presented sufficient evidence to establish that he has a mental disorder, but he does dispute that the state presented sufficient evidence to establish that he was a danger to himself, a danger to others, or unable to provide for his basic needs. For the reasons explained below, we agree with appellant.

We turn first to the trial court's conclusions that appellant was a danger to himself and others. To establish that a person is "[d]angerous to self," *former* ORS 426.005(1)(e)(A) (2014), the state must establish that "the person's 'mental disorder would cause him or her to engage in behavior that is likely to result in physical harm to himself * * * in the near term.'" *State v. B. B.*, 240 Or App 75, 82, 245 P3d 697 (2010) (quoting *State v. Olsen*, 208 Or App 686, 691, 145 P3d 350 (2006)). The potential harm must be serious physical harm. *Id.* "Indeed, a number of our cases have suggested that the potential harm must be 'life-threatening' or involve some 'inherently dangerous' activity." *Id.* at 82-83 (quoting *State v. Judd*, 206 Or App 146, 152, 135 P3d 397 (2006)). In addition, the potential harm must be more than "speculative." *State v. Roberts*, 183 Or App 520, 524, 52 P3d 1123 (2002); *see also State v. Ayala*, 164 Or App 399, 404, 991 P2d 1100 (1999) ("Apprehensions, speculations and conjecture are not sufficient to prove a need for mental

commitment."). The state must present evidence of a "particularized and highly probable threat to [the person's] safe survival, including a risk of substantial harm, in the near future." *B. B.*, 240 Or App at 84 (internal quotation marks and citations omitted); *see also Olsen*, 208 Or App at 693 ("Evidence of delusions, general lack of judgment, and failure to plan for release * * * is simply not the kind of evidence of a particularized, near-term threat that is required to justify appellant's involuntary commitment on the ground that he is a danger to himself."); *State v. Jacobson*, 142 Or App 371, 377, 922 P2d 670 (1996) ("Evidence of general mental and physical deterioration is insufficient to justify a finding of mental illness under the danger to self standard.").

Similarly, to establish that a person is "[d]angerous to * * * others," *former* ORS 426.005(1)(e)(A) (2014), the state must establish that "actual future violence is highly likely." *State v. L. D.*, 247 Or App 394, 400, 270 P3d 324 (2011). "Specific acts of violence are not required to establish dangerousness." *State v. M. R.*, 225 Or App 569, 574, 202 P3d 221 (2009). Past acts, including verbal acts, can justify a finding of dangerousness, "so long as the acts clearly form a foundation for predicting future dangerousness." *Id.* (internal quotation marks omitted). "Conclusions based on conjecture as to whether appellant poses a danger to others are insufficient." *State v. Woolridge*, 101 Or App 390, 394, 790 P2d 1192, *modified on recons*, 102 Or App 559, 794 P2d 1258 (1990).

In this case, the state failed to present legally sufficient evidence that appellant posed a nonspeculative danger to himself or others. There was no evidence that appellant had injured or threatened to injure himself or anyone else. The trial court reasoned that appellant was at risk of being injured or injuring someone else because he might overreact to another's actions. Evidence that a person is likely to engage in actions that will provoke an assaultive response may be enough to support a civil commitment on the theory that the person is a danger to himself, but there is no such evidence here. *See Judd*, 206 Or App at 154 (evidence that appellant engaged in bizarre and argumentative behaviors was insufficient to establish that he was a danger to himself where there was no evidence that his behaviors "actually led

to—or even were likely to lead to—appellant being harmed in any way"); *see also State v. B. P.*, 229 Or App 487, 493, 211 P3d 975 (2009) (evidence that a person is "agitated and aggressive is not sufficient evidence" to establish that the person is dangerous to others); *M. R.*, 225 Or App at 576 (evidence that appellant had repeated unwanted contacts with another person and entered others' offices and rooms uninvited "may have been socially uncomfortable or unpleasing," but "[could ]not properly be characterized as physically dangerous to others"). Although appellant had engaged in inappropriate and offensive behaviors on the plane and strange and disconcerting behaviors at the bank, those behaviors do not establish that it is likely that he is going to be physically attacked or that he is going to physically attack someone else.

The record contains evidence that, as a result of his arrest at the airport, appellant sustained a small rug burn, and that he was charged with resisting arrest as a result of his conduct at the bank. But we have "never indicated that a person's agitation or lack of cooperation when being taken into custody, in and of itself, renders a person dangerous," as to justify civil commitment. *State v. J. G.*, 218 Or App 398, 401, 180 P3d 63, *rev den*, 345 Or 94 (2008) (footnote omitted). Rather, we have consistently held that evidence of a struggle with arresting officers is legally insufficient to permit the conclusion that a person is a danger to himself or others. *See, e.g., State v. A. M. R.*, 236 Or App 186, 192, 235 P3d 720 (2010) (appellant's physical response to being taken into custody was insufficient to support commitment on the ground that she was a danger to others); *State v. Miller*, 198 Or App 153, 159, 107 P3d 683 (2005) (evidence that appellant reacted violently when officers attempted to remove her from her backyard was insufficient to establish that she had "a propensity to react violently *** or that there is a high probability that she will commit a violent act in the future").

The record also contains evidence that appellant was delusional. But the mere fact that a person is delusional is legally insufficient to establish that the person is a danger to himself or others. *See, e.g., B. B.*, 240 Or App at 78, 84-85 (evidence that appellant, who was barefoot and in hospital scrubs, was driven by her delusions to run from the

hospital and attempt to enter an airport terminal where she could not provide any identifying information and could not assist those attempting to help her was insufficient to establish that appellant was a danger to herself); *State v. Hayes*, 202 Or App 63, 71, 121 P3d 17 (2005) (risks from appellant acting in response to her auditory hallucinations were too attenuated and speculative to justify commitment on the ground that she was a danger to herself).

In sum, although the record establishes that appellant was delusional, had engaged in inappropriate behaviors, and had struggled when being taken into custody, it does not establish that there was a "particularized and highly probable threat to [his] safe survival," *B. B.*, 240 Or App at 84 (internal quotation marks and citations omitted), or that it was "highly likely" that he would engage in "actual future violence," *L. D.*, 247 Or App at 400. Therefore, the trial court erred in concluding that appellant was dangerous to himself and others.

Having concluded that the state failed to present legally sufficient evidence that appellant posed a danger to himself and others, we turn to the trial court's conclusion that appellant was "unable to provide for [his] basic personal needs and [was] not receiving such care as is necessary for health and safety." *See former* ORS 426.005(1)(e)(B) (2014). To establish that a person is unable to provide for his basic needs, the state must establish that the person, "due to a mental disorder, is unable to obtain some commodity (*e.g.*, food and water) or service (*e.g.*, life-saving medical care) without which he cannot sustain life." *State v. Bunting*, 112 Or App 143, 145, 826 P2d 1060 (1992). In other words, "the state must present evidence that the person's mental disorder creates an imminent and serious threat to the person's health and safety." *State v. D. M.*, 245 Or App 466, 473, 263 P3d 1086 (2011). "Although it is correct that the state need not postpone commitment until the mentally ill person is on the brink of death, the goal of the statute is to authorize involuntary commitment only when an imminent threat to safe survival exists." *State v. M. C.*, 227 Or App 530, 534, 206 P3d 1096 (2009). "Evidence that the person suffers from a mental disorder that impairs his or her judgment and has caused discomfort or minor injury is legally insufficient to

support a basic needs commitment." *D. M.*, 245 Or App at 473.

Here, appellant was in custody and was receiving food and water. Although appellant had delusions about his food and water being poisoned, the record is legally insufficient to support a conclusion that his delusions threatened his near-term survival. Kelley testified that appellant had lost between 10 and 15 pounds, but the record does not indicate that that weight loss had a negative effect on appellant's health, much less that it threatened his survival. And, as noted, Grooms testified that appellant was eating and drinking, albeit irregularly, despite his delusions. Thus, although appellant was experiencing delusions about food and water and had lost weight, the evidence was insufficient to establish an "imminent and serious threat" to his health and safety. *See State v. M. J.*, 245 Or App 553, 559, 263 P3d 1115 (2011) (evidence that appellant's unreasonable paranoia affected his diet was insufficient to support a "basic needs" commitment, where "nothing in the record suggest[ed] that appellant was in imminent danger of malnutrition or starvation").

The trial court expressed concern about appellant's ability to provide for his basic needs if he was released from jail on his misdemeanor charges and was not detained by immigration officials. As mentioned, the court believed appellant was unable to make and follow through with a plan. But the record is insufficient to establish that appellant's inability to make and follow through with a plan would threaten his near-term survival. Even assuming that appellant would be homeless upon release, "[h]omelessness is not, by itself, sufficient grounds for [a 'basic needs'] commitment." *Hayes*, 202 Or App at 67 (citing *State v. Baxter*, 138 Or App 94, 99, 906 P2d 849 (1995)). Rather, the record must persuasively establish that, because of the totality of the circumstances, "appellant, if homeless, 'probably would not survive in the near future.'" *Id.* (quoting *Bunting*, 112 Or App at 146); *see also M. J.*, 245 Or App at 558-59 (although appellant could not articulate a plan for where he would go if released from the hospital, commitment was not justified because "nothing on the record indicates that homelessness would create an imminent threat to his survival").

Here, even assuming that appellant would be released from custody, the record is insufficient to establish that appellant would face an "imminent threat to [his] safe survival." *M. C.*, 227 Or App at 534.

In sum, the evidentiary record is legally insufficient to establish that appellant was a danger to himself or others or unable to provide for his basic needs. Therefore, the trial court erred by committing appellant.

Reversed.