Submitted March 3, reversed November 9, 2016

In the Matter of S. P.,
a Person Alleged to have a Mental Illness.
## STATE OF OREGON,
*Respondent,*

*v.*

## S. P.,
*Appellant.*

Marion County Circuit Court
15MH00553; A158141

387 P3d 443

Victoria K. Moffett filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Paul L. Smith, Deputy Solicitor General, and Judy C. Lucas, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, and Lagesen, Judge, and Garrett, Judge.

**GARRETT, J.**

In this civil commitment case, appellant seeks reversal of the trial court's judgment committing him to the Oregon Mental Health and Developmental Disability Services Division for a period not to exceed 180 days. The trial court ordered that appellant be civilly committed on the grounds that appellant was: (1) dangerous to others; and (2) unable to meet his own basic health and safety needs. Appellant argues that the state failed to establish either ground by clear and convincing evidence. We agree, and reverse.

An involuntary civil commitment requires the state to prove, by clear and convincing evidence, that a person is mentally ill and that, because of the illness, the person is a danger to self, a danger to others, or unable to meet the person's own basic needs. *State v. D. L. W.*, 244 Or App 401, 404, 260 P3d 691 (2011); *former* ORS 426.005(1)(e)(A), (B) (2013), *amended by* Or Laws 2015, ch 433, § 1, *renumbered as* ORS 426.005(1)(f)(A), (B) (2015). Whether the statutory criteria are met is determined by the appellant's condition at the time of the hearing as understood in the context of the appellant's history. *State v. M. R.*, 225 Or App 569, 574, 202 P3d 221 (2009).

Appellant does not request that we review his case *de novo*, and we decline to do so. *See* ORS 19.415(3)(b) ("[T]he Court of Appeals, acting in its sole discretion, may try the cause anew upon the record or make one or more factual findings anew upon the record."); ORAP 5.40(8)(c) ("The Court of Appeals will exercise its discretion to try the cause anew on the record or to make one or more factual findings anew on the record only in exceptional cases."). Accordingly, we review the trial court's legal conclusions for errors of law but are bound by its findings of historical fact unless there is no evidence to support them. *State v. D. R.*, 239 Or App 576, 579, 244 P3d 916 (2010).

Where, as here, an appellant challenges the legal sufficiency of the evidence supporting the trial court's determination that the appellant was dangerous to himself, dangerous to others, or unable to meet his basic needs, the question for us is whether the trial court's determination

was permissible on the record before it. *State v. R. L. W.*, 267 Or App 725, 728, 341 P3d 845 (2014) (citing *Dept. of Human Services v. N. P.*, 257 Or App 633, 639-41, 307 P3d 444 (2013) (en banc)). Whether the evidence is legally sufficient to support a determination under ORS 426.005(1) that the appellant is dangerous or unable to meet his basic needs "is a determination that we review as a matter of law." *State v. S. R. J.*, 281 Or App 741, 748-49, 386 P3d 99 (2016).

With those legal standards in mind, we state the facts "'consistently with the trial court's express and implied findings' as supplemented with uncontroverted contextual information from the record." *State v. B. B.*, 240 Or App 75, 77, 245 P3d 697 (2010) (quoting *State v. D. R.*, 239 Or App 576, 579, 244 P3d 916 (2010)).

Appellant was arrested and charged with second-degree disorderly conduct and second-degree criminal trespass. No information about the arrest, nor any facts underlying those charges, is in the record, except that appellant's conduct apparently involved "looking in people's houses." Appellant was held in the Douglas County Jail for an unspecified period of time, later described by appellant as "not long[,]" during which he refused to eat or drink and behaved in such a manner that jail employees believed he was "psychotic," "disorganized [and] delusional," experiencing hallucinations, and "unable to take care of himself." Based on those conditions, appellant was taken to an emergency room on October 6, 2014, where the admitting physician described him as "agitated, * * * confused and unable to care for himself." The physician also described appellant as "frankly psychotic" with "tangential speech [and] flight of ideas." The next day, appellant was involuntarily admitted on a physician's hold at the Bay Area Hospital in Coos Bay. There, treating physicians elected to extend the "hold" for a "diversion" period of 14 days.[1]

During that period, a mental health investigator recommended that appellant be civilly committed into state custody on the grounds that appellant was a danger

---

[1] As described in OAR 309-033-0210, diversion is a "14 day period of intensive treatment when a director and a psychiatrist certify a person as a mentally ill person pursuant to the provision of ORS 426.237(1)(b)."

to himself and others and was unable to meet his own basic health and safety needs. A hearing was held on October 23, 2014.

At the hearing, the state called one witness, Dr. Young, a psychiatrist who had been treating appellant at Bay Area Hospital. Young testified that appellant, who was 45 years old at the time of the hearing, was suffering from "long-standing" schizoaffective disorder with psychosis and had been "since before he was an adult." While hospitalized, appellant received two prescriptions to treat his schizoaffective disorder. Appellant had been "compliant and cooperative" in taking those prescriptions until the morning of the commitment hearing, at which point he refused to take them.

Young also explained that appellant had been hospitalized on at least two prior occasions at Bay Area Hospital, most recently from August 27 to September 19, 2014. Young did not describe the circumstances that led to either earlier hospitalization but said that, after "the last two times" appellant was released from the hospital, appellant stopped taking his prescriptions "very shortly thereafter" and had not pursued any mental health treatment on his own.

Young also described his reasons for believing that appellant posed a danger to others:

"[P]rior to [appellant's current] admission[,] he was looking in people's houses, which might have resulted in some violent encounter but, more importantly, since he's been admitted he frequently attacks other male peers verbally and then will stare at them and then starts to swing through the air. He hasn't actually hit anyone but he does this almost on a daily basis. Yesterday, he threw a water bottle during this episode and he challenged a couple of the other patients, male patients, to a fight but they did not react. He also threatens staff when they try to intervene."[2]

Young later clarified that appellant "doesn't attempt to hit [other patients] but he approaches them and swings in their direction," and that "he threatens to beat up the

---

[2] The record does not specify that appellant hit anyone with the water bottle, nor did it specify as to whether he was attempting to throw it at anyone in particular or whether it was full or empty.

other patients and he threatened staff with violence." Young also noted that these were "unprovoked attacks" and that appellant had made those threats "every day," perhaps "in response to hallucinations telling him to do that." As a result, appellant had been placed in seclusion "nearly every other day" while hospitalized. The day before the hearing, appellant was locked in seclusion and hospital staff were "unable to release him" because he was "very agitated, and kicking * * * and beating on the doors." However, Young was unaware of any history of violent behavior by appellant before his hospitalization. Young noted that, during appellant's past hospitalization a few weeks earlier, appellant exhibited "the same behavior of becoming very angry and loud mid-mornings."

Young also testified that, in addition to schizoaffective disorder, appellant was being treated with three medications for "severe hypertension." Young was "not sure what [appellant's] prognosis would be if he were never treated[,] but it certainly would be very hard on his arteries and his brain." During appellant's last hospitalization, he had taken medication for his hypertension while there, but it was Young's "impression" that, after being released, appellant "took his medicines, if at all, only for a very short period." As to his physical condition, appellant was not malnourished when he arrived at the hospital, he had been eating, drinking, and sleeping adequately while there, and his weight had been "consistent." Young also had no knowledge of appellant's living situation prior to his current hospitalization other than that "he tends to move around a good deal." Young nevertheless concluded that "two issues" would "interfere" with appellant's ability to care for himself outside a hospital setting:

"First, he has delusions and if he were to make and implement a plan it might be to do something that had nothing to do with reality. The second problem is he's not really thinking in an organized way that he could make and implement a plan. So for those reasons I don't think he would survive long at all."

The trial court also received a report from a mental health examiner, Abrahamson, who had examined appellant the day of the hearing and was present during the

hearing. Abrahamson's report noted, in relevant part, that appellant's "verbal behavior was aggressive and angry"; that appellant "often lives with his parents" who reside in Minnesota, and that his "current housing [was] unknown." Further, Abrahamson noted that appellant "provokes [and] threatens other persons" at the hospital, that staff was "required to intervene in these altercations[,]" and that appellant's "behaviors indicate a lack of behavioral control and he appears at a high risk to harm someone else or get harmed by others if not in a supervised setting." Abrahamson's report concluded that appellant "appears to be too delusional and disorganized in his thinking to provide for his own health and safety. He has no one to assist him."[3]

Appellant also testified at the hearing. When asked about "attacking" other patients at the hospital, appellant responded, in part, "They have a lot of juvenile delinquents that come there and I have to protect myself so I choose solitary confinement." When asked whether he wanted to hurt anyone, appellant responded, "No."

On cross-examination, appellant made a number of statements, including, among others, that it was "an easy walk" from Portland to Roseburg and that he had previously walked to Alaska from Oregon to see his girlfriend. He also said that he was living outside and "at the Motel 6 until [he] ran out of money" and that he had "a thousand dollars" in a bank account.

At the conclusion of the hearing, the trial court found that appellant was not a danger to himself, but was a danger to others and was unable to provide for his own basic needs. The court explained:

---

[3] Appellant contends that Abrahamson's report is not properly considered part of the trial record because it was not "admitted" at the commitment hearing. We first note that that contention is unpreserved, as appellant raised no objection regarding whether Abrahamson's report was properly received into evidence when it was offered to the trial court. *See State v. Wyatt*, 331 Or 335, 341, 15 P3d 22 (2000) ("Generally, an issue not preserved in the trial court will not be considered on appeal."). Further, the record shows that Abrahamson submitted his report to the trial court, and the court acknowledged its receipt by requiring Abrahamson, under oath, to swear to the veracity of its contents. We, therefore, conclude that the record adequately shows that the report was admitted into evidence.

"Well, I find that he is suffering from a mental disease or disorder described as, I think, as schizoaffective disorder with psychosis. He certainly appears to be, based upon his behavior here in court and what he says what he wants to do and has done he is lacking a perception of reality by his behavior here in court and based upon that it has affected him. I'm not finding that he's dangerous to himself. The only way that he's dangerous to himself is if one of the other patients were to react and injure him in response to his threats or his behavior to them and that is not as direct, I think, as required.

"I'm finding that he is dangerous to others. But for the intervention of staff in those altercations or swings and threats, and I did hear about threats towards staff and agitation and him swinging at others. But for the intervention of staff someone was going to get injured. If not him, it's going to be somebody else. He also appears unable to care for his basic needs based upon the reference to and his report here to not eating, drinking, and that's what led to his being taken to the hospital. Currently, but for the hospitalization, he wouldn't be able to care for himself. He's delusional about his walking to Alaska. He says he walked from here to Portland and his plans for himself if he wasn't hospitalized and based upon that I'm finding and I am directing him to be placed in the custody of the hospital for up to six months. And, as well, he wouldn't voluntarily medicate himself or deal with any treatment. And based upon that I'm going to commit him to the Mental Health Division for a period not to exceed six months."

On appeal, the trial court's finding that appellant suffers from a mental disorder is not disputed. Rather, the parties' arguments focus on the findings that appellant is a danger to others and is unable to provide for his own basic needs.

To establish that a person is a danger to others, "the state must establish that 'actual future violence is highly likely.'" *State v. M. A.*, 276 Or App 624, 629, 371 P3d 495 (2016) (quoting *State v. L. D.*, 247 Or App 394, 400, 270 P3d 324 (2011)). Accordingly, the question on appeal is whether the evidence in the record would permit the finding that, as of the time of the hearing, it was highly likely that appellant would engage in violence in the future.

Here, the evidence is insufficient to permit that determination. There is no evidence in the record that appellant has ever actually engaged in violent conduct, despite being 45 years old and having suffered from serious mental illness since his youth. Although the record contains evidence that, in the two-week period preceding the commitment hearing, appellant was confrontational and made verbal threats and threatening gestures on a daily basis, including swinging his arms at other patients, there is no evidence that appellant was at risk of actually hitting someone. On the contrary, the uncontroverted evidence—in the form of testimony from Young—was that appellant did *not* attempt to hit anybody.

Notwithstanding the lack of any direct evidence of historical or intended violence by appellant, the trial court relied on the evidence that staff members intervened and placed appellant in seclusion to infer that appellant was engaging in conduct that made him dangerous to others. Although that might have been a reasonable inference on a different record, it is not reasonable on this record in light of Young's affirmative testimony that appellant did *not* attempt to hit anyone. In light of that testimony, the evidence of intervention by staff is equally consistent with an inference that staff acted simply to maintain order by removing a disruptive person.[4]

For those reasons, we conclude that the evidence in the record was not sufficient to permit the finding that it was highly likely that appellant would engage in future violence. Accordingly, the trial court erred in civilly committing appellant on the ground that he was a danger to others.

We must next consider whether the trial court erred in concluding that appellant was unable to meet his own

---

[4] As noted above, the trial court also received a report from Abrahamson opining that appellant was dangerous. It is apparent from the record, however, that Abrahamson based that opinion on the evidence that staff intervened to seclude appellant from other patients. But, as we have explained, on this record, in light of Young's testimony that appellant did not try to hit anyone, the fact that staff intervened and placed appellant in seclusion is insufficient to support a rational inference that appellant was highly likely to commit violence.

basic health and safety needs due to his mental illness.[5] To meet that standard, the state must establish by clear and convincing evidence that "the individual, due to a mental disorder, is unable to obtain some commodity (*e.g.*, food and water) or service (*e.g.*, life-saving medical care) without which [the individual] cannot sustain life." *State v. Bunting*, 112 Or App 143, 145, 826 P2d 1060 (1992). The legislature's "basic needs" commitment standard "focuses on the capacity of the individual to survive, either through [the individual's] own resources or with the help of family or friends." *Id.*; *see also State v. Sea,* 137 Or App 333, 336, 904 P2d 182 (1995) ("Basic needs are those things necessary to sustain life." (Internal quotation marks omitted.)). While the state "'need not postpone commitment until the mentally ill person is on the brink of death,'" the purpose of the statute is "'to authorize involuntary commitment only when an imminent threat to safe survival exists.'" *M. A.*, 276 Or App at 631 (quoting *State v. M. C.*, 227 Or App 530, 534, 206 P3d 1096 (2009)).

In this case, the state argues that the trial court's basic-needs determination is supported by evidence of appellant's refusal to eat or drink while in jail; his delusions about being able to walk to Alaska; his "severe hypertension which, if left untreated, would put him at risk of a heart attack or stroke"; his inability to implement and make a plan for meeting his needs upon release from the hospital; and his failure to follow a treatment regimen after previous hospitalizations. For the reasons explained below, that evidence is insufficient to support the inference that appellant's near-term survival was in jeopardy at the time of the hearing.

The significance of appellant's refusal to eat and drink while in jail is undermined by the lack of information about the duration of the jail stay, other than appellant's

---

[5] In 2015, the legislature amended the "basic needs" provision of the civil commitment statute. *See former* ORS 426.005(1)(e)(B) (2013), *amended by* Or Laws 2015, ch 433, § 1, *renumbered as* ORS 426.005(1)(f)(B) (2015). Because the amended statute did not provide for retroactive application, we apply the statutory language that existed at the time of appellant's hearing. *See Black v. Arizala*, 337 Or 250, 271, 95 P3d 1109 (2004) (applying law as it existed prior to amendment, absent retroactivity provision).

testimony that it was "not long." Moreover, there is no evidence that he was malnourished when he arrived there, or that his health was affected by his refusal to eat and drink for that indeterminate period. Young testified that, at the time of the commitment hearing, appellant was eating, drinking, and sleeping adequately and that his weight had not changed. In short, the record does not support a rational inference that appellant's diet, at the time of the hearing, posed a threat to his well-being.

Likewise, although appellant suffers from delusions, the record contains no evidence that any of those delusions have manifested in ways that threaten his life or health. Appellant's beliefs that it is "an easy walk" between Portland and Roseburg and that he has walked from Oregon to Alaska may be objectively unreasonable, but there is no evidence in the record that those beliefs pose a risk to his "capacity * * * to survive." *Bunting*, 112 Or App at 145.

Although appellant's failure to consistently take medication for his hypertension may be unwise, on this record, any inference that that failure jeopardizes his near-term survival is speculative. The record is devoid of evidence regarding the short-term medical consequences of appellant's failing to take hypertension medication regularly, and Young testified affirmatively that he was "not sure what [appellant's] prognosis would be if he were never treated." *See State v. H. N.*, 180 Or App 541, 544, 547, 43 P3d 1218 (2002) (reversing an appellant's civil commitment on the grounds that he was unable to care for himself, despite the appellant's refusal to acknowledge and comply with treatment for his mental illness and serious diabetic condition—which put him at great risk of losing limbs and blindness—because those circumstances did not amount to a failure to meet "his basic needs—*i.e.*, food, water, shelter, and life saving medical treatment").

Finally, there is no evidence that appellant's inability to follow a plan "would threaten his near-term survival." *M. A.*, 276 Or App at 632. Even assuming that appellant would be homeless if not hospitalized, "homelessness is not, by itself, sufficient grounds for a 'basic needs' commitment" absent evidence that would permit an inference that

homelessness, under the circumstances, would jeopardize appellant's near-term survival. *Id.* (quoting *State v. T. L. H.*, 202 Or App 63, 67, 121 P3d 17 (2005) (brackets omitted)).

In sum, the evidentiary record is legally insufficient to support a finding that appellant was a danger to others or unable to provide for his basic needs. Therefore, the trial court erred in committing appellant.

Reversed.