Submitted March 21, reversed April 26, 2017

In the Matter of T. Y.,
a Person Alleged to have a Mental Illness.
STATE OF OREGON,
*Respondent,*

*v.*

T. Y.,
*Appellant.*

Multnomah County Circuit Court
16CC02695; A162258

396 P3d 986

Joseph DeBin and Multnomah Defenders, Inc., filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Leigh A. Salmon, Assistant Attorney General, filed the brief for respondent.

Before Sercombe, Presiding Judge, and DeHoog, Judge, and Flynn, Judge pro tempore.

**SERCOMBE, P. J.**

Appellant seeks reversal of a judgment involuntarily committing him to the custody of the Mental Health Division based on a finding that, because of a mental disorder, appellant was a danger to himself. *See* ORS 426.005(1)(f); ORS 426.130. Appellant contends that the state failed to establish by clear and convincing evidence that he was a danger to himself.[1] As explained below, we agree and, accordingly, reverse.

When we review a challenge to a civil commitment judgment, unless we exercise our discretion to review the matter *de novo*, "we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *State v. M. A.*, 276 Or App 624, 625, 371 P3d 495 (2016) (internal quotation marks omitted). Here, the parties have not requested *de novo* review and, in any event, it is not a case in which we would conclude that *de novo* review is warranted. *See* ORAP 5.40(8). Accordingly, we state the facts in accordance with the trial court's express and implied findings and review the trial court's conclusion that the requirements for commitment were satisfied to determine if it is supported by legally sufficient evidence. *M. A.*, 276 Or App at 625.

Appellant has a psychotic disorder that causes him to experience auditory command hallucinations. In April 2016, the voices that he hears instructed appellant to kill himself. As appellant saw it, those voices wanted him to believe that he was evil and to kill himself; however, "it was really murder" that would be "perceived as a suicide." He believed that his GPS unit was also "directing [him] to suicide." Appellant sent text messages to his parents stating that he was going to kill himself and drove to a bridge in Washington. He got out of his car, walked to the edge of the bridge, and looked over it for 30 to 45 seconds. Deciding he

---

[1] Appellant also raises a second assignment of error that, in light of our resolution of his first assignment of error, we do not address.

did not want to die and that he had gone too far, appellant called a suicide hotline for help and, ultimately, with his parents' encouragement, sought help at a local hospital.

Immediately before his hospitalization, appellant was suffering from an internal hemorrhoid that he believed was "nano-induced anal probing." According to appellant, the "probing" was one of the reasons he had gone to the bridge to kill himself. At the hospital, appellant received treatment for the hemorrhoid. At the hearing, appellant testified that, although he believed that the hemorrhoid had "nothing to do with the nano-induced anal probing," he nonetheless had "stopped being probed."

Appellant testified that the voices had also tried to kill him and make it look like suicide a couple of times in the past and, according to appellant's father, appellant had talked about suicide in emails in the months leading up to the incident in April. However, appellant had not attempted suicide in the past and, according to the doctor that had been treating him in the hospital, did not have ongoing suicidal ideation. He did not suffer from depression and his disorder was not one of "chronic suicidality." Indeed, appellant testified that he wants to live. He stated that he does not want to hurt or kill himself and has no plans to do so, and, if the voices told him to jump off a bridge again, he would not do it.

According to appellant, some of the voices are "on [his] side" and others are not, and it can sometimes be difficult to tell "friend" from "foe." The voices are "pretty stubborn," and appellant believes that other people would not be able to handle them as he does. He explained that he had "been able to deal with the voices for going on 13 years now" but that it could "get pretty tough." Appellant has a history of impulsive behavior. On one occasion, without warning, he jumped up out of bed and grabbed his father. However, appellant did not injure his father and that was the only occasion on which he had acted in that way. Most recently, the voices had instructed appellant to move to Utah and, believing the voices instructing him to do so to be benign, he intended to follow that instruction.

Appellant believes that many of the problems he experiences are caused by nanotechnology, and that he can obtain a strong magnet that will resolve his symptoms. Appellant refuses to take medication, which he does not believe helps his symptoms. He testified that he has "always heard voices on every medication" he has taken in the past and that, at times when the voices were not an issue for him, "[i]t was their free will when they decided not to mess with [him], not having anything to do with the effect of the medication." In other words, medication was ineffective and, anytime in the past that people had thought that appellant was doing better on medication, it was only "because the voices had decided not to talk on that day."

The trial court found, by clear and convincing evidence, that appellant suffers from a mental disorder. The court further explained that, although appellant's expressed "suicide ideation" was of concern, it was

> "quite frankly, more concerned about the voices and what they're telling him to do [because] I don't know what they're [going] to tell him to do next, whether it's going to be to jump off a bridge or if it's going to be get in his car and—and drive into a wall, or some of the things that we have heard, you know, in other cases, but it's—it's the totally unpredictable nature of the auditory hallucinations."

Thus, the trial court's focus was on appellant engaging in behavior that would put him "in harm's way." In light of the evidence, the court concluded that it was highly probable that appellant would place himself in harm's way in the near future and, accordingly, entered a judgment committing him to the custody of the Mental Health Division for a period not to exceed 180 days.

On appeal, appellant argues that there is insufficient evidence that, because of his mental disorder, he is a danger to himself. As noted, whether the evidence is sufficient to support a determination that appellant is a danger to himself is a question we review as a matter of law. *See State v. S. R. J.*, 281 Or App 741, 748-49, 386 P3d 99 (2016). To establish that a person is dangerous to self, under ORS 426.005(1)(f), "the state must present evidence that the person's mental disorder would cause him or her to engage in

behavior that is likely to result in physical harm to himself or herself in the near term." *State v. B. B.*, 240 Or App 75, 82, 245 P3d 697 (2010) (internal quotation marks and brackets omitted). The threatened harm must, "at minimum, involve actual physical harm," and that physical harm must be serious. *Id.* (internal quotation marks omitted). "Indeed, a number of our cases have suggested that the potential harm must be life-threatening or involve some inherently dangerous activity." *Id.* at 82-83 (internal quotation marks omitted). Furthermore, "the potential harm must be more than speculative." *M. A.*, 276 Or App at 628 (internal quotation marks omitted). Rather, the evidence must be of a "particularized and highly probable threat to [the person's] safe survival, including a risk of substantial harm, in the near future." *Id.* at 629 (brackets in original; internal quotation marks omitted); *see State v. T. R. O.*, 208 Or App 686, 693, 145 P3d 350 (2006) ("Evidence of delusions, general lack of judgment, and failure to plan for release * * * is simply not the kind of evidence of a particularized, near-term threat that is required to justify appellant's involuntary commitment on the ground that he is a danger to himself.").

As we discussed in *B. B.*, our "decisions addressing putative 'danger to self' commitments based on 'harm's way' concerns highlight the proper application of the foregoing legal principles." 240 Or App at 83. In *T. R. O.*, "we held that evidence that the appellant, who suffered from delusions, had 'poor judgment,' and had a tendency to 'travel aimlessly' and to 'walk into people's homes' was insufficient to establish the requisite danger to self." *B. B.*, 240 Or App at 83 (quoting *T. R. O.*, 208 Or App at 689-90). "Similarly, in [*State v. K. P.*, 178 Or App 89, 35 P3d 1084 (2001)], we concluded that the facts that appellant lacked self-control, had lost a significant amount of weight, and had repeatedly hit her head against a Plexiglass divider separating the front and back seats in a police car, was insufficient to sustain a commitment based on danger to self." *B. B.*, 240 Or App at 84. In *B. B.*, we concluded that evidence was insufficient to support a commitment based on danger to self where the appellant was confused and disorganized, "had a pattern of unpredictably and impulsively running away when the voices she hears tell her that she or her child is in some kind of danger," had,

on at least three occasions, run away "apparently guided by her command hallucinations," and suffered cuts, abrasions, and swelling to her face. *Id.* at 84 (internal quotation marks omitted). In *S. R. J.*, the appellant suffered from significant delusions and had been involved in several incidents involving traffic. In the first, the appellant was standing in the middle of a busy road trying to direct traffic, with traffic on the road backed up and vehicles stopped in all directions, and, when an officer tried to get her to move to the side of the road, ran from the officers into the middle of the lane of traffic. In the second incident, the appellant was near an intersection screaming and yelling at passing vehicles. We concluded that there was insufficient evidence for a commitment based on danger to self, because, although her "delusional interactions with traffic" were not safe, there was not evidence that those situations exposed the appellant to the type of danger that constituted a particularized and highly probable threat to her safe survival. 281 Or App at 753.

Thus, as our cases have consistently emphasized, delusional or eccentric behavior, even if inherently risky, is not necessarily sufficient to warrant commitment. *B. B.*, 240 Or App at 85; *see S. R. J.*, 281 Or App at 750. Where the evidence does not establish that delusional, unpredictable, and impulsive behavior has resulted "in any serious harm or substantial proximate risk of such harm, much less that a reoccurrence of such conduct will present a nonspeculative risk in the near future," we have concluded that the evidence is legally insufficient to support a commitment on the basis of danger to self. *B. B.*, 240 Or App at 85.

In light of those standards, in this case, viewed in the light most favorable to the trial court's ruling, the evidence was insufficient to support the involuntary commitment. The evidence clearly establishes that appellant suffers from significant delusions, including auditory command hallucinations, that he is impulsive, that he refuses medication for his condition, and that he sometimes has difficulty differentiating between voices that are "evil" and those that are benign. However, the evidence is legally insufficient to support the involuntary commitment. Although clearly appellant's initial decision to follow the instruction of the voices he hears to kill himself was serious and, as the trial

court noted, concerning, appellant also, without any initial outside intervention, decided not to actually kill himself and obtained help. He had not engaged in past suicide attempts, and it was undisputed that, at the time of the hearing, appellant did not intend to hurt himself or have ongoing suicidal ideation. Indeed, the basis for the trial court's decision was its concern that the auditory hallucinations were "totally unpredictable" and the court could not tell what the "voices * * * [would] tell [appellant] to do next" and, therefore, appellant was likely to put himself in harm's way. Aside from the serious incident where appellant went to the bridge and looked over the edge before deciding he had "gone too far" and seeking help, there is no evidence that appellant, over the many years that he has suffered from the delusions, has actually placed himself in harm's way. And, with respect to that incident, he was not saved from harm by mere fortune or the intervention of another person. Instead, appellant made the decision to walk away from the edge because he recognized the risk and did not want to die. There is no other evidence that appellant has ever engaged in behavior that caused him any physical harm, much less serious physical harm, has a pattern of placing himself in risky situations, or has been at risk of serious harm and saved by the intervention of another. In sum, the evidence does not establish that there was a particularized and highly probable threat to appellant's safe survival as a result of his mental disorder. Accordingly, the evidence is legally insufficient to establish that appellant is a danger to himself and the trial court erred in committing him.

Reversed.