GARRETT, J.
*1034 *726 Appellant seeks reversal of a judgment authorizing his involuntary commitment to the Oregon Health Authority for up to 180 days under ORS 426.130. The trial court ordered that appellant be committed for involuntary mental-health treatment based on findings that appellant, as a result of his mental illness, is unable to meet his own basic health and safety needs and is a danger to others. We conclude that neither finding is supported by legally sufficient evidence, and we reverse the judgment of commitment.
Appellant requests that we review the matter de novo . We conclude that this is not an exceptional case warranting such review, and we decline appellant's request. See ORAP 5.40(8)(c) (providing that the court will exercise its discretion to review de novo "only in exceptional cases"). Accordingly, "we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." State v. T. Y. , 285 Or.App. 21, 22, 396 P.3d 986 (2017) (internal quotation marks omitted).
Appellant has been diagnosed with paranoid schizophrenia. For approximately one year prior to the commitment hearing, as a result of pending criminal charges, appellant was in custody both at Multnomah County Detention Center (MCDC) and the Oregon State Hospital (OSH). For the first month in custody, appellant was housed at MCDC, and then he was transferred to OSH for a mental-health evaluation, which ultimately resulted in a determination that appellant was unable to aid and assist in his defense and would remain so for the foreseeable future. Appellant then returned to MCDC, and his criminal charges were dismissed. A magistrate judge initiated the civil-commitment process, and, after remaining at MCDC for approximately one month, appellant was moved to a hospital for the week prior to the commitment hearing under a warrant of detention. See generally ORS 426.070 (outlining the procedures for initiation of the civil-commitment process and the detention of persons facing commitment).
*727 At a commitment hearing in March 2015, appellant was "highly agitated" and in restraints.[1] At the beginning of the hearing, he repeatedly interrupted the trial judge by making statements such as "I plead the fifth," and, "Statutes of limitations apply." He then proceeded to interrupt the proceedings by shouting statements, such as "You are condemned!" and "Vengeance is the Lord[']s!", and he continued to yell despite instructions to stop. When the examiners attempted to question him, appellant shouted statements such as "Murderer!" and "Don't talk to me!" The trial court eventually observed that it was unclear whether appellant could "tolerate" being present, and appellant apologized, stating that he had "overstepped the line." The court then removed appellant from the courtroom without objection from either counsel, and the court continued the hearing outside of appellant's presence.
The principal witness for the state was a nurse from MCDC who had worked with appellant during both of his stays there. The nurse testified that, during appellant's first stay on MCDC, he made statements "about being entitled to have multiple women in his cell to do whatever he pleased with," but he "[w]asn't ever really * * * aggressive," "[j]ust very delusional."
The nurse testified that, when appellant returned to MCDC in the month prior to the commitment hearing, he informed the staff that he would not take medications or eat, but he was "never aggressive about it." He made statements about "being poisoned,"
*1035 and, at one point, he explained to MCDC staff that he would not eat while in the jail because of the "[a]ir quality." He stated that he would eat if he were hospitalized and that if he were released from jail, he "needed berries and bottled water." The nurse testified that, during the first two weeks after his return to MCDC, appellant ate only one apple and drank one meal supplement. Because of appellant's refusal to eat, MCDC sent him to the emergency room to be evaluated for dehydration and malnutrition, but test results indicated that "everything was within normal limits." Just before being moved to the hospital in the week *728 before the hearing, appellant ate several pieces of fruit and drank another meal supplement. The nurse testified that there was no indication that appellant had not been eating while at OSH, and she opined that appellant must have been drinking water from the faucet in his cell at MCDC or he would have shown signs of dehydration. She testified that she did not know whether appellant had lost any weight, but during his last few days at MCDC, "his cheeks started to look more sunken in[,] and he was starting to look [paler], less energetic, [and] more lethargic."
The nurse also described appellant's conduct during his most recent stay at MCDC as "generally very calm," "mostly polite," and "pretty passive." Appellant had been avoiding interaction with others, but when he did speak to staff, his speech was "fairly disorganized." As far as the nurse was aware, appellant had not made "any physical moves" toward other people at MCDC, nor any sexually related statements to MCDC staff as he had in his first stay there a year earlier. She testified that appellant's mental condition had remained "about the same" throughout his most recent stay at MCDC but that appellant's "affect and presentation" at the hearing seemed much worse than it had the last time she observed him, one week earlier.
A mental-health consultant also testified at the hearing. She stated that she had interacted with appellant one time after he returned to MCDC from OSH. According to the consultant, appellant refused to speak to her about planning for his release, and, in her opinion, appellant was unable to "develop a plan and execute a plan for meeting his basic needs."
The state also offered portions of a precommitment report reflecting that appellant had refused to discuss with the investigator the reasons that appellant was being held in the hospital. When asked why he had refused to eat while at MCDC, appellant stated, "I eat a little," but when hospital staff offered him lunch, he declined.
Both examiners opined that appellant was unable to meet his basic needs and was a danger to others. One stated that, based on appellant's conduct during the hearing, "if he weren't handcuffed, I'm not sure if he wouldn't *729 also have been physically aggressive." The other stated that, although appellant was in restraints, he was "still quite intimidating," observing that "the volume of his voice could be heard" from the other room.
Appellant's counsel argued that the state had not presented sufficient evidence to justify commitment based either on appellant's dangerousness or his inability to meet basic health and safety needs.
In support of civil commitment, the state pointed to appellant's conduct during the hearing as evidence that appellant posed a danger to others, arguing that, "if he were released today, someone could find his conduct very threatening and respond in kind." With respect to appellant's basic needs, the state relied on the fact that appellant was unable to "articulate a reasonable and credible plan for how [he] would care for [his] basic needs," as well as appellant's refusal to eat while in jail.
The trial court ruled for the state, concluding that, due to his mental illness, appellant is a danger to others and is unable to meet his own basic needs. With respect to appellant's dangerousness, the court reasoned as follows:
"Because [appellant] was so highly, highly agitated today, he was brought back to the hospital a while ago and that's why he's not been present. Everybody agreed that [it] was in his best interest to be brought back to the hospital. It seemed that * * * the hearing was * * * increasing his agitation[,]
*1036 and it was not fair to him to have him in this environment and become more out of control. * * * [Appellant's] presentation here today in court was very, very agitated. He remained in cuffs due to his agitation. He yelled, cursed, was unable, we were unable to really conduct the examination today and he simply couldn't, could not tolerate being in our presence. He yelled at me over and over again as he also yelled at the examiners. So, today in court he had a very difficult time controlling his behavior. He was very verbally aggressive, very hostile[,] and it is that behavior that causes me concern. I think that the behavior is a direct result of his mental disorder, his untreated mental disorder when he was, the testimony was when he as, arrived back at the jail on the (inaudible) is he was more calm and appropriate. Now off his medication for a couple *730 weeks he's back to being very aggressive, agitated, out of control, and responding to * * * internal stimuli * * *. In any event, * * * the State has proved to me by clear and convincing evidence that due to his mental disorder, he is unable to control his behavior at this point in time such that he poses a danger to others. I don't know much about the underlying criminal activity so I really can't rely upon that as, as part of being a danger to others, but simply by his presentation in Court here today I think was sufficient for me to have, to meet the State's burden."
Although the court described appellant as "aggressive," nothing in the record indicates that appellant threatened or made any attempt to harm another person during the hearing. With respect to appellant's ability to meet his own basic needs, the court reasoned that appellant's refusal to eat was based on his delusional beliefs, those beliefs may not be entirely "situational" to the jail environment, and appellant was "unable to communicate any way that he would be able to meet his basic needs" or "accept the assistance that would be offered." On appeal, as below, appellant argues that neither of the trial court's principal findings is supported by legally sufficient evidence.
A person may be involuntarily committed for mental health treatment for up to 180 days if, after a hearing, the court determines that he is a "person with mental illness." ORS 426.130(1)(a)(C). As relevant to this case, a "person with mental illness" includes a "person who, because of a mental disorder," is "[d]angerous to self or others" or is "[u]nable to provide for basic personal needs and is not receiving such care as is necessary for health and safety." Former ORS 426.005(1)(e) (2014), amended by Or. Laws 2015, ch. 433, § 1, renumbered as ORS 426.005(1)(f) (2015). The state must prove the statutory requirements of involuntary commitment by clear and convincing evidence. ORS 426.130(1) ; see State v. D. M. , 245 Or.App. 466, 470-71, 263 P.3d 1086 (2011) (explaining that the clear-and-convincing standard of proof "applies in civil commitment hearings in order to protect the strong personal and liberty interests at stake"). "The clear and convincing evidence standard is a rigorous one, requiring evidence that is of extraordinary persuasiveness, and which makes the fact in issue highly probable."
*731 State v. M. R. , 225 Or.App. 569, 574, 202 P.3d 221 (2009) (internal quotation marks omitted).
We first turn to whether the record permits the trial court's finding that appellant presented a danger to others. "Whether a person is a danger to others is determined by his condition at the time of the hearing as understood in the context of his history." State v. L. R. , 283 Or.App. 618, 625, 391 P.3d 880 (2017) (brackets and internal quotation marks omitted). To permit a finding that a person is dangerous to others, the state must prove that it is "highly likely" that the person will commit an act of actual violence in the future. State v. L. D. , 247 Or.App. 394, 400, 270 P.3d 324 (2011). Proof that the person has previously engaged in specific acts of violence is not necessary to permit a finding of dangerousness, but other past acts, including verbal acts, can justify such a finding only if the acts " 'clearly form a foundation for predicting future dangerousness.' " State v. M. A. , 276 Or.App. 624, 629, 371 P.3d 495 (2016) (quoting M. R. , 225 Or.App. at 574, 202 P.3d 221 ).
*1037 Here, we conclude that the state failed to present legally sufficient evidence that appellant was a danger to others at the time of the hearing. The record contains no evidence that appellant committed an act of physical aggression at any time relevant to the commitment proceeding, nor is there record evidence that he explicitly threatened to commit an act of violence. The only witness who spent a significant amount of time with appellant prior to the hearing affirmatively stated that appellant had not been aggressive or made any "physical moves" toward anyone. Cf. State v. S. P. , 282 Or.App. 177, 184, 387 P.3d 443 (2016) (insufficient evidence supported finding of dangerousness when there was no record evidence that the appellant had ever committed an act of violence, and, despite the fact that the appellant was "confrontational[,] and made verbal threats and threatening gestures on a daily basis," there was affirmative testimony that the appellant had not attempted to hit anyone).
Indeed, the trial court did not purport to base its decision on any conduct by appellant prior to the hearing; rather, the trial court's determination of dangerousness was based on appellant's demeanor at the hearing itself.
*732 Although it is true, as appellant acknowledges, that the record of the hearing may not disclose the full contours of appellant's behavior, those aspects of appellant's "presentation" expressly relied upon by the trial court-his agitation, "verbal[ ] aggressi[on]," and inability to tolerate participation in the commitment proceeding-are insufficient to establish a foundation for predicting his future dangerousness. As our cases demonstrate, the fact that a person may frighten others, "get agitated, be aggressive, or have the bad judgment to act in ways that make people uncomfortable is not enough to determine that he is a danger to others." L. R. , 283 Or.App. at 627-28, 391 P.3d 880 ; cf. S. P. , 282 Or.App. at 184, 387 P.3d 443 (insufficient evidence supported finding that the appellant was dangerous to others, despite evidence that he "was confrontational and made verbal threats and threatening gestures on a daily basis, including swinging his arms at other patients" because the uncontroverted evidence showed that the appellant did not actually attempt to hit anyone). Thus, we conclude that the record of appellant's "presentation" at the hearing is insufficient to sustain a finding that " 'actual future violence [by appellant] is highly likely.' " See State v. S. R. J. , 281 Or.App. 741, 749, 386 P.3d 99 (2016) (quoting M. A. , 276 Or.App. at 629, 371 P.3d 495 ).[2]
We also conclude that the record does not contain legally sufficient evidence to permit a finding that, as a result of appellant's mental illness, he is unable to meet his own basic health and safety needs. Under the definition of "person with mental illness" in effect at the time of the commitment hearing, former ORS 426.005(1)(e) (2013), in order to justify an individual's involuntary commitment, "the *733 state's evidence must demonstrate that a person's inability to meet his or her own basic needs as a result of a mental disorder makes it likely that the person will not survive in the near term." State v. S. R. , 267 Or.App. 618, 619, 341 P.3d 160 (2014). In other words, the state must prove by clear and convincing evidence that appellant lacks "the capacity * * * to survive, either through his own resources or with the help of family or friends" because, due to his mental disorder, he "is unable to obtain some commodity (e.g. , food and water) or service (e.g. , life-saving medical care) without which he cannot sustain life." Id. (internal quotation marks omitted). "A person's ability to provide *1038 for his or her basic needs is assessed at the time of the commitment hearing in the light of existing, as opposed to future or potential conditions." D. M. , 245 Or.App. at 471, 263 P.3d 1086 (internal quotation marks omitted).
Here, the record, along with reasonable inferences drawn therefrom, does not establish that there existed a nonspeculative threat to appellant's near-term survival. Although appellant experienced delusions relating to food and water, and he ate sporadically while housed at MCDC, the record does not demonstrate that his refusal to eat posed an imminent threat to his health and safety. Medical testing revealed that appellant was not malnourished or dehydrated, and the nurse's observation that he appeared pale and lethargic, without more, does not permit an inference that his near-term survival was imminently threatened by a lack of sufficient food or water. Cf. M. A. , 276 Or.App. at 632, 371 P.3d 495 (insufficient evidence supported "basic needs" commitment when the appellant ate and drank on an irregular basis, and the state failed to adduce evidence that the appellant's weight loss demonstrated a serious threat to his near-term health and safety); S. R. , 267 Or.App. at 620, 341 P.3d 160 (insufficient evidence supported "basic needs" commitment because, although the appellant was losing weight as of the time of the hearing, "the record is devoid of evidence that appellant's weight loss was of such a degree that her survival was at risk"); State v. M. J. , 245 Or.App. 553, 559, 263 P.3d 1115 (2011) (insufficient evidence supported "basic needs" commitment because, despite the appellant's paranoia-driven dietary habits, "nothing in the record suggested that appellant was in imminent danger of malnutrition or *734 starvation," nor did the appellant have special, medically-required dietary needs).
Further, the court's reliance on appellant's inability "to communicate any way that he would be able to meet his basic needs" or "accept the assistance that would be offered" is also insufficient to support a "basic needs" commitment. A person's inability to develop and follow through with a release plan is insufficient by itself to establish that the person is unlikely to survive in the near term. M. A. , 276 Or.App. at 632, 371 P.3d 495 ; see also D. M. , 245 Or.App. at 473, 263 P.3d 1086 ("Evidence that the person suffers from a mental disorder that impairs his or her judgment and has caused discomfort or minor injury is legally insufficient to support a basic needs commitment."). It is reasonable to infer that, if appellant remained in a mental condition similar to that which he experienced during the hearing, he would face significant hurdles to accessing services or obtaining necessities. Yet, the record does not support a conclusion that appellant was highly likely to remain in that state, as the evidence showed that appellant had not been taking medication for the past month and, nevertheless, he was not in a consistent state of being "out of control," making "hostile" statements, or shouting. The court even observed that it was the hearing itself that precipitated appellant's agitated state. In addition, the state offered no evidence demonstrating that, in the past, due to "hostile," "aggressive," or delusional behavior caused by his mental illness, appellant was unable to provide for his own needs while out of custody. See id. at 471, 263 P.3d 1086 ("A 'basic needs' commitment must be based on 'more than evidence of speculative threats to safe survival.' " (Quoting State v. A. M.-M. , 236 Or.App. 598, 605, 238 P.3d 407 (2010).). Accordingly, the record does not substantiate a particularized and highly probable threat to appellant's survival in the near future based on an inability to provide for his basic needs.
In sum, the record evidence was legally insufficient to support the judgment.
Reversed.

There is no indication in the record that appellant had attempted or threatened an act of violence prior to the hearing that necessitated the use of restraints.

The dissent argues that the record is insufficient to permit meaningful review of the trial court's determination that appellant was a danger to others. We agree that we must give deference to the trial court's demeanor-based observations in civil-commitment proceedings. We disagree, however, that the breadth of some of the terms that the trial court used to describe appellant's in-court behavior (like "aggression" and "hostility") renders its determination unreviewable, where the record otherwise fails to reflect any overt acts demonstrating dangerousness. Moreover, from the examiner's statement that "if [appellant] weren't handcuffed, I'm not sure if he wouldn't also have been physically aggressive," the logical inference is that, during the hearing, appellant was not "physically aggressive." Given that the examiners and the trial court took pains to describe what they had observed for the record, it is appropriate to base our review on what they described, rather than to speculate about possible additional behavior that they observed and did not describe.