HADLOCK, P. J.
*684 Appellant seeks reversal of an order that continues his commitment to the Oregon Health Authority (OHA) for an additional period not to exceed 180 days. The order is based solely on a determination that appellant's mental disorder has left him unable to provide for his basic needs out-side a hospital setting; the court found that the state did not prove that appellant is dangerous to himself or others. On appeal, appellant contends that the record does not support a determination that his mental disorder leaves him unable to provide for his basic needs. We agree and, accordingly, reverse.[1]
A person who has been committed may have the commitment continued involuntarily if a court determines, by clear and convincing evidence, that he or she "[i]s still a person with mental illness and is in need of further treatment." ORS 426.307(6) ; ORS 426.301. ORS 426.005(1)(f) describes three circumstances in which an individual may be deemed a "[p]erson with mental illness" for purposes of the commitment statutes. Only one of those circumstances is pertinent here: Under ORS 426.005(1)(f)(B), a person has a mental illness if, because of a mental disorder, *379 the person is "[u]nable to provide for basic personal needs that are necessary to avoid serious physical harm in the near future, and is not receiving such care as is necessary to avoid such harm."
Dr. Shad, a physician at the Oregon State Hospital, testified that appellant suffers from a form of dementia that causes delusions, behavioral changes, and personality changes. Appellant started experiencing personality changes in about 2013 and was originally hospitalized in Coos County in September 2016. Appellant was moved to the state hospital in January 2017 and Shad began treating him about two months later; Shad remained appellant's physician through the time of the commitment hearing in August of that year.
Shad described this case as "very unfortunate," explaining that the type of dementia from which appellant *685 suffers causes personality changes that are "very difficult especially for relatives and the loved ones to deal with." No medications have been approved to treat the illness. Accordingly, Shad researched case studies and "very cautiously started [appellant] on the medication which has the best evidence for this kind of disorder." Appellant's "danger problems" have "significantly reduce[d]" since he began that medication regimen, which includes antidepressants and sleep aids. However, Shad believes that appellant will stop taking his medications immediately if he is released from the hospital because he has no "insight, whatsoever, into his illness." A disruption of medication would have negative consequences. First, Shad described the disruption as "toxic to the brain." Second, if appellant stops taking the medications, he will relapse in a matter of days and "will lose control over the behavior that [the hospital has] been managing very nicely here."
Shad has been working hard to find "a lower level of care" for appellant because state hospital personnel have done as much as they can for him. He wanted to be able to discharge appellant "to a place where he can be managed," noting that appellant "can survive * * * provided that his treatment continues." Because no new placement has yet been identified, Shad recommended that appellant remain hospitalized.
Shad testified that he does not believe that appellant "will survive out there" without supervision. He also testified that appellant cannot take care of himself independently and did not have a real plan for where he would go if he were discharged. However, Shad was not asked to explain what he meant when he stated that appellant would not survive on his own. With respect to activities of daily living, Shad testified that he had heard that appellant had to be asked to complete "some stuff" but did well on other things; Shad did not have "the details of that." Shad gave one specific example of appellant's inability to care for himself, testifying that appellant probably would not be able "to fix a proper meal." The type of dementia from which appellant suffers can lead to "abnormal eating behavior"; in appellant, that has manifested in "him begging for * * * all the time sweets." Shad testified that such behavior would be dangerous "on a long *686 term basis"; the medications that appellant takes "cause so many changes and if you are just eating sugar that is, especially in a patient like this, * * * a big risk." Shad asserted that "there are long term risks, there are short term risks, there are risks all over the place," but he was not asked to describe what those risks were.
Appellant also testified at the hearing. The trial court could reasonably view that testimony as confirming that appellant suffers delusions that interfere with his understanding of the world around him.
At the end of the hearing, the trial court rejected the state's arguments that appellant is mentally ill because his mental disorder makes him dangerous to himself or to others. However, the court was persuaded that appellant is mentally ill because his mental disorder leaves him unable to provide for his basic needs. The court found that appellant has no insight into the nature of his illness and that he would not take medications if released from the hospital. Appellant challenges that ruling on appeal, arguing that the evidence is insufficient to establish that, if not hospitalized, he would be "[u]nable to provide for [his] basic personal needs that *380 are necessary to avoid serious physical harm in the near future." ORS 426.005(1)(f)(B). We agree.
The record in this case strongly supports a determination that appellant suffers a mental disorder that causes significant and persistent delusions. It also supports the trial court's explicit finding that appellant will stop taking his medications if he is released from the hospital. In addition, the record would support a finding that appellant's disorder may leave him unable to make any coherent plan for housing or obtaining healthy food if he stops taking his medications.
It also is clear that Shad is gravely concerned about appellant's ability to survive if he is released from the hospital; indeed, Shad does not "think [that appellant] will survive out there" without supervision. In the context of the record developed in this case, however, that statement by Shad is insufficient to support a finding that, if not hospitalized, appellant will be unable to avoid serious physical harm in the near future. First, the statement-again, as *687 made in the context of this case-is a conclusory assertion that reflects the legal question at issue, rather than evidence of what actually will happen to appellant if he is released. Second, and relatedly, the record does not reflect what Shad meant when he asserted that appellant will not survive. That is, no evidence in this record establishes how appellant's inability to make plans for obtaining housing or healthy food will, "in the near future," lead to appellant suffering "serious physical harm." ORS 426.005(1)(f)(B). Nor is there evidence establishing how the other unspecified "risks" that Shad spoke of will lead to those results. In the absence of such evidence, we must reverse the order of commitment.
Reversed.

Because we reverse on that basis, we need not address the additional arguments that appellant makes on appeal.