Submitted July 27, 2021, reversed December 14, 2022

In the Matter of A. B. K.,
a Person Alleged to have Mental Illness.

STATE OF OREGON,
*Respondent,*

*v.*

A. B. K.,
*Appellant.*

Lincoln County Circuit Court
20CC04633; A174567

522 P3d 894

Appellant appeals from a judgment committing him to the custody of the Mental Health Division for a period not to exceed 180 days and an order prohibiting the purchase and possession of firearms, based on a finding that appellant is a person with mental illness. Appellant argues that the trial court erred in committing him under ORS 426.130 because the record lacked clear and convincing evidence to establish that he was a person with mental illness, as defined by ORS 426.005(1)(f). In appellant's view, his diagnosis of autism spectrum disorder constituted a developmental disorder, not a mental disorder; thus, the state failed to prove that he was a person who, because of a mental disorder was a danger to others, *i.e.*, a person with mental illness for purposes of a civil commitment under ORS 426.130. *Held*: Autism spectrum disorder does not qualify as a mental disorder for purposes of ORS 426.005(1)(f) and civil commitment under ORS 426.130. Accordingly, because the evidence was that appellant's only diagnosis was autism spectrum disorder, there was not sufficient evidence in the record to support the trial court's determination that appellant was a person with mental illness.

Reversed.

Marcia L. Buckley, Judge.

Alexander C. Cambier and Multnomah Defenders, Inc., filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Rolf C. Moan, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, and Shorr, Judge, and Powers, Judge.

POWERS, J.

Reversed.

**POWERS, J.**

In this civil commitment proceeding, appellant appeals from a judgment committing him to the custody of the Mental Health Division for a period not to exceed 180 days and an order prohibiting the purchase and possession of firearms. In his sole assignment of error, appellant argues that the trial court erred in committing him under ORS 426.130 because the record lacked clear and convincing evidence to establish that he was a person with mental illness, as defined by ORS 426.005(1)(f). In appellant's view, his diagnosis of autism spectrum disorder constituted a developmental disorder, not a mental disorder; thus, the state failed to prove that he was a person who, because of a mental disorder was a danger to others, *i.e.*, a person with mental illness for purposes of a civil commitment under ORS 426.130. As explained below, we conclude that autism spectrum disorder does not qualify as a mental disorder for purposes of ORS 426.005(1)(f). Accordingly, because the trial court erred in finding that appellant was a person with mental illness, we reverse.

Neither party has requested that we review the record *de novo*, and we conclude that this is not an "exceptional" case for purposes of *de novo* review. *See* ORAP 5.40(8)(c) (providing that the court will exercise its discretion to review *de novo* "only in exceptional cases"). Thus, we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record is legally sufficient to permit that outcome. *State v. T. W. W.*, 289 Or App 724, 726, 410 P3d 1032 (2018). We review questions of statutory construction for legal error. *State v. C. P.*, 310 Or App 631, 636, 486 P3d 845 (2021).

On appeal, appellant's challenge is narrow. He does not challenge the trial court's finding of dangerousness to others, nor does he dispute his diagnosis of autism spectrum disorder. Instead, he argues that the state failed to prove that he had a mental disorder for purposes of civil commitment under ORS 426.130 because his autism spectrum disorder was a developmental disability or disorder rather than a mental disorder. Although appellant has framed his

argument in terms of the state failing to present sufficient evidence in this particular case, we also understand his argument to suggest that the state could not, as a matter of law, prove that autism spectrum disorder is a "mental disorder" as defined by ORS 426.005(1)(f) for purposes of civil commitment under ORS 426.130.

The state responds that the record entitled the trial court to conclude that appellant's autism spectrum disorder was a mental disorder for purposes of a civil commitment under ORS 426.130. Noting that the legislature has not defined the term "mental disorder," the state argues that the trial court was entitled to rely on expert witnesses and the record as a whole to determine whether appellant had a mental disorder. Based on expert testimony showing that appellant has autism spectrum disorder and because the *Diagnostic and Statistical Manual of Mental Disorders* (5th ed 2013) (DSM-5) describes autism spectrum disorder as a "mental disorder," the state argues that there was sufficient evidence for the trial court to conclude that appellant had a mental disorder.

Although neither party engages in a statutory interpretation analysis to determine whether autism spectrum disorder qualifies as a "mental disorder" within the meaning of ORS 426.005(1)(f), we begin with that question. *See Strasser v. State of Oregon,* 368 Or 238, 260, 489 P3d 1025 (2021) (explaining that an appellate court has an independent duty to correctly interpret any statute that comes before it, "regardless of the arguments and interpretations offered by the parties"); *Stull v. Hoke*, 326 Or 72, 77, 948 P2d 722 (1997) (observing that an appellate court is responsible for identifying the correct interpretation of a statute, "whether or not asserted by the parties"). Accordingly, we consider the statute's text in context, with reference to pertinent legislative history, consistently with the methodology described in *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009).

ORS 426.005 defines terms used within the statutory framework for a civil commitment of a person with mental illness under ORS 426.130. *See* ORS 426.005(1) (defining terms used in ORS 426.005 to 426.390); ORS 426.130 (providing for the civil commitment of a person with mental

illness). In this case, we focus on ORS 426.005(1)(f), which provides, in part:

> "'Person with mental illness' means a person who, because of a mental disorder, is one or more of the following:
>
> "(A)   Dangerous to self or others."

ORS 426.005 does not define the phrase "mental disorder." When the legislature has not defined a term, we ordinarily look to the plain meaning of a statute's text as a key first step in determining what a particular term means. *Comcast Corp. v. Dept. of Rev.*, 356 Or 282, 295, 337 P3d 768 (2014). We frequently consult dictionary definitions of the terms on the assumption that, if the legislature did not give the term a specialized definition, the dictionary definition reflects the meaning that the legislature would naturally have intended. *Id*. at 296. An important exception to that general approach arises when the legislature uses technical terminology— often called "terms of art"—drawn from a specialized trade or field. *Id*. In that circumstance, we look to the meaning and usage of those terms in the discipline from which the legislature borrowed them. *Id*. For example, when the legislature uses terms drawn from disciplines such as psychiatry or medicine, the court might consider the DSM-5. *See id*. at 296-97 (citing *Tharp v. PSRB*, 338 Or 413, 423, 110 P3d 103 (2005) (explaining that, in the statute providing for guilty except for insanity defense, "'mental disease or defect' and 'personality disorder,' *** are terms of art that are used in the context of professional disciplines such as psychiatry and psychology"); *Mueller v. PSRB*, 325 Or 332, 339, 937 P2d 1028 (1997) (observing that, in the context of determining the jurisdiction of the Psychiatric Security Review Board over the petitioner, the phrase "personality disorder" is a "term of art as to which the DSM-III was the definitive source")).

Accordingly, we look to the DSM-5, which provides:

> "Each disorder identified in Section II of the manual [Diagnostic Criteria and Codes] *** must meet the definition of a mental disorder. Although no definition can capture all aspects of all disorders in the range contained in DSM-5, the following elements are required:

"A mental disorder is a syndrome characterized by clinically significant disturbance in an individual's cognition, emotion regulation, or behavior that reflects a dysfunction in the psychological, biological, or developmental processes underlying mental functioning. Mental disorders are usually associated with significant distress or disability in social, occupational, or other important activities. An expectable or culturally approved response to a common stressor or loss, such as the death of a loved one, is not a mental disorder. Socially deviant behavior (*e.g.*, political, religious, or sexual) and conflicts that are primarily between the individual and society are not mental disorders unless the deviance or conflict results from a dysfunction in the individual, as described above."

DSM-5 at 20.

The DSM-5 explains that "[t]his definition of mental disorder was developed for clinical, public health, and research purposes" and that "[a]dditional information is usually required beyond that contained in the DSM-5 diagnostic criteria in order to make legal judgments[.]" *Id*. It also contains a cautionary statement as to "the risks and limitations of its use in forensic settings[,]" describing "the imperfect fit between the questions of ultimate concern to the law and the information contained in a clinical diagnosis." *Id*. at 25. Importantly, the DSM-5 observes that "the clinical diagnosis of a DSM-5 mental disorder *** does not imply that an individual with such a condition meets legal criteria for the presence of a mental disorder or a specified legal standard[.]" *Id*.

The DSM-5 subsequently includes autism spectrum disorder in Section II, Diagnostic Criteria and Codes, as a neurodevelopmental disorder, which is "a group of conditions with onset in the developmental period" that also includes conditions such as "intellectual disability (intellectual developmental disorder)." *Id*. at 31. The discussion in the DSM-5 of autism spectrum disorder includes diagnostic criteria, recording procedures, specifiers, and diagnostic features, among other information. In describing the diagnostic features of autism, the DSM-5 provides, "Autism spectrum disorder encompasses disorders previously referred to as early

infantile autism, childhood autism, Kanner's autism, high-functioning autism, atypical autism, pervasive developmental disorder not otherwise specified, childhood disintegrative disorder, and Asperger's disorder." *Id*. at 53.

The inclusion of a particular condition in the DSM-5, however, is not necessarily the definitive indicator of what qualifies as a mental disorder for purposes of civil commitment, as the cautionary notes in the DSM-5 provide and our case law interpreting related statutes suggests. Our recent decision in *State v. H. L. C.*, 318 Or App 449, 507 P3d 346 (2022), is instructive. In *H. L. C.*, we concluded that an intellectual disability does not qualify as a mental disorder for purposes of ORS 426.701, the statute that provides for the civil commitment of extremely dangerous persons with mental illness to the Psychiatric Security Review Board (PSRB).[1] *H. L. C.*, 318 Or App at 450. At the time of the appellant's commitment hearing, neither ORS 426.701 nor the administrative rules adopted by the PSRB to carry out the provisions of ORS 426.701 addressed whether a mental disorder included an intellectual disability.[2] *H. L. C.*, 318 Or App at 452.

---

[1] ORS 426.701 provides, in part:

"(3)(a)   At the hearing on the petition, the court shall order the person committed as an extremely dangerous person with mental illness under the jurisdiction of the Psychiatric Security Review Board for a maximum of 24 months if the court finds, by clear and convincing evidence, that:

"(A)   The person is extremely dangerous;

"(B)   The person suffers from a qualifying mental disorder that is resistant to treatment; and

"(C)   Because of the qualifying mental disorder that is resistant to treatment, the person committed one of the following acts: ***[.]

"* * * * *

"(13)   The board shall adopt rules to carry out the provisions of this section and ORS 426.702."

[2] OAR 859-200-0020 (Feb 22, 2021), which defined mental disorder for purposes of ORS 426.701 at the time of commitment at issue in *H. L. C.*, was amended before we issued our decision in that case and now expressly provides that an intellectual disability or developmental disability does not qualify as a mental illness, *i.e.*, a qualifying mental disorder. OAR 859-200-0020 (Jan 13, 2022) provides, in part:

"(10)   'Qualifying Mental disorder' means a mental illness that is resistant to treatment. A "qualifying mental disorder" is resistant to treatment if, after receiving care from a licensed psychiatrist and exhausting all reasonable psychiatric treatment, or after refusing psychiatric treatment, the person continues to be significantly impaired in the person's ability to make

Mental disorder was not statutorily defined and, although an administrative rule purported to define mental disorder, its definition was not helpful. *Id*. We, therefore, turned to the ordinary meaning of the terms "mental disorder" and "intellectual disability" as defined by a dictionary, and we considered the context provided by related statutes, particularly ORS chapter 427. *Id*. at 452-53. We did not, however, consider the DSM-5, which categorizes intellectual disability as a mental disorder. Rather, based on the ordinary meanings of mental disorder and intellectual disability, we inferred that "the legislature would have understood that an intellectual disability is not a mental disorder." *H. L. C.*, 318 Or App at 453. We further concluded that the legislature intended to distinguish between mental disorder and intellectual disability because of the organization of ORS chapters 426 and 427, observing that "ORS chapter 426 applies to persons with mental illness and nowhere uses the term intellectual disability, while ORS chapter 427 applies to persons with an intellectual or developmental disability and nowhere uses the term mental illness or mental disorder." *Id*. In particular, we pointed to ORS 427.290, which outlines commitment procedures for a person with an intellectual disability. *Id*.; *see* ORS 427.290.[3] We reasoned that

---

competent decisions and to be aware of and control extremely dangerous behavior.

"(11)   'Mental illness' means:

"(a)   Any diagnosis of mental disorder which is a significant behavioral or psychological syndrome or pattern that is associated with distress or disability causing symptoms or impairment in at least one important area of an individual's functioning that is resistant to treatment.

"(b)   The term 'mental illness' does not include an abnormality manifested solely by repeated criminal or otherwise antisocial conduct. The term 'mental illness' does not include a disorder constituting solely a personality disorder and excludes a diagnosis of an intellectual disability or developmental disability as defined in ORS 427.005."

[3]  ORS 427.290 provides, in part:

"After hearing all of the evidence, and reviewing the findings of the investigation and other examiners, the court shall determine whether the person has an intellectual disability and because of the intellectual disability is either dangerous to self or others or is unable to provide for the personal needs of the person and is not receiving care as is necessary for the health, safety or habilitation of the person. *** If in the opinion of the court the person has, by clear and convincing evidence, an intellectual disability and is in need of commitment for residential care, treatment and training, the court may order as follows:

the presence of the provision in ORS chapter 427 specifically providing for the commitment of persons with intellectual disabilities further supported "the legislature's intention to not treat a person with an intellectual disability as a person with a mental disorder." *H. L. C.*, 318 Or App at 453. Ultimately, we concluded that an intellectual disability did not qualify as a mental disorder for purposes of the civil commitment of an extremely dangerous person with a mental illness. *Id.*

Similarly, in this case, despite the broad definition in the DSM-5 of mental disorder and its categorization of autism spectrum disorder as a mental disorder, the context provided by related statutes—*viz.*, ORS chapter 427, ORS 426.701, and our prior interpretation of those statutes—signifies that the legislature did not intend to treat a person with a developmental disability such as autism spectrum disorder as a person with a mental disorder for purposes of civil commitment under ORS 426.130.

The contents of ORS chapter 427—which specifically addresses persons with developmental or intellectual disabilities and references autism in the course of defining a "developmental disability"—indicates that the legislature did not intend to treat a developmental disability such as autism spectrum disorder as a mental disorder in ORS chapter 426. *See* ORS 427.005(4)(c) ("'Developmental disability' means autism *** diagnosed by a qualified professional that *** [i]s not attributed primarily to other conditions including, but not limited to, a mental or emotional disorder[.]").[4] With some exceptions, ORS chapter 427

---

"*****

"(3) If in the opinion of the court voluntary treatment and training or conditional release is not in the best interest of the person, the court may order the commitment of the person to the department for care, treatment or training. The commitment shall be for a period not to exceed one year with provisions for continuing commitment pursuant to ORS 427.235 to 427.290."

[4] ORS 427.005 provides, in part:

"(4) 'Developmental disability' means autism, cerebral palsy, epilepsy or other condition diagnosed by a qualified professional that:

"(a) Originates before an individual is 22 years of age and is expected to continue indefinitely;

"(b) Results in a significant impairment in adaptive behavior as measured by a qualified professional;

treats persons with developmental and intellectual disabilities similarly, and the chapter provides for a wide range of rights and services for persons with developmental and intellectual disabilities and establishes the Oregon Human Rights Commission, the purpose of which "is to safeguard the dignity and basic human rights of individuals who have an intellectual or developmental disability." ORS 427.401 (establishing the Oregon Human Rights Commission). *See, e.g.*, ORS 427.107 (enumerating rights of persons receiving developmental disability services); ORS 427.107(b) ("'Person' means an individual who has an intellectual or developmental disability as defined in ORS 427.005 and receives services from a program or facility."); ORS 427.007 ("Individuals with intellectual and other developmental disabilities and society as a whole benefit when the individuals exercise choice and self-determination[.]"); ORS 427.121 (addressing right of an adult with intellectual or developmental disabilities to choose community living setting). As we reasoned in *H. L. C.*, the legislature's intent to distinguish a developmental or intellectual disability from a mental disorder or mental illness is manifest in the separate organization of ORS chapter 427 and ORS chapter 426. *See H. L. C.*, 318 Or App at 453 (so concluding). ORS chapter 427 expansively addresses developmental disabilities while ORS chapter 426 does not use the term developmental disability, which implies that the civil commitment procedures in ORS chapter 426 are not intended to encompass people diagnosed solely with a developmental disability. *Cf. PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993) (setting out contextual rules that "use of a term in one section and not in another section of the same statute indicates a purposeful omission, and that the use of the same term throughout a statute indicates that the term has the same meaning throughout the statute" (citations omitted)). At the very least, the context provided by ORS chapter 427 offers no indication that the legislature intended persons diagnosed

---

"(c) Is not attributed primarily to other conditions including, but not limited to, a mental or emotional disorder, sensory impairment, substance abuse, personality disorder, learning disability or attention deficit hyperactivity disorder; and

"(d) Requires supports similar to those required by an individual with an intellectual disability."

solely with developmental disabilities such as autism spectrum disorder to be encompassed within the civil commitment procedures provided in ORS chapter 426.

We note as well that, under the administrative rule in effect at the time of appellant's commitment, a developmental disability was not a qualifying mental disorder for the civil commitment of an extremely dangerous person with mental illness. ORS 426.701 provides for the commitment of extremely dangerous persons with mental illness, and ORS 426.701(13) grants rulemaking authority to the PSRB to carry out the provisions of ORS 426.701. The administrative rule in effect at the time of appellant's commitment hearing provided that the "term 'mental disorder' *** excludes a diagnosis of a developmental disability[.]" OAR 859-200-0020(9)(b) (Mar 5, 2014).[5] Thus, a person could not be civilly committed under the statutory framework for an extremely dangerous person if their diagnosis was a developmental disability, *e.g.*, autism spectrum disorder. Although that exclusion stems from an administrative rule promulgated by an agency rather than a statute enacted by the legislature and applies to a different statutory framework than ORS 426.130, we nevertheless view that exclusion as informative that civil commitments under ORS 426.130 are likewise not intended to apply on the basis of a developmental disability. That is, if a person cannot be committed under the ORS 426.701 extremely dangerous standard on the basis of a developmental disability such as autism spectrum disorder, we conclude that it is likely that the legislature intended

---

[5] OAR 859-200-0020 (Mar 5, 2014) provided, in part:

"(9) 'Mental disorder' means:

"* * * * *

"(b) The term 'mental disorder' does not include an abnormality manifested solely by repeated criminal or otherwise antisocial conduct. The term 'mental disorder' does not include a disorder constituting solely a personality disorder and excludes a diagnosis of a developmental disability such as mental retardation, brain damage or other biological dysfunction that is associated with distress or disability causing symptoms or impairment in at least one important area of an individual's functioning."

As noted above, OAR 859-200-0020 has since been amended and now expressly provides, in part, that "the term 'mental illness' does not include a disorder constituting solely a personality disorder and excludes a diagnosis of an intellectual disability or developmental disability as defined in ORS 427.005." OAR 859-200-0020(11)(b) (Jan 13, 2022).

that a person could likewise not be committed under the ORS 426.130 civil commitment standard based solely on having a developmental disability such as autism spectrum disorder.

Lastly, we have found no legislative history that clarifies the legislature's intent as to whether autism spectrum disorder is a "mental disorder" for purposes of ORS 426.005(1)(f) and ORS 426.130. *See, e.g.*, *State v. Smith*, 71 Or App 205, 208, 692 P2d 120 (1984) (explaining that the legislative history of ORS 426.005 does not clarify the meaning of "mental disorder").

In sum, despite the categorization by the DSM-5 of autism spectrum disorder as a mental disorder, we conclude that the legislature did not intend to include developmental disorders such as autism spectrum disorder as mental disorders for purposes of ORS 426.005(1)(f) and civil commitment under ORS 426.130. The legislature, of course, could broaden the civil commitment framework if it determines that, as a matter of policy, a diagnosis that is listed in the DSM-5, such as autism spectrum disorder, should automatically qualify as a mental disorder for purposes of civil commitments under ORS 426.130. In our view, however, the context provided by related statutes leads us to conclude that the legislature did not intend to include developmental disorders such as autism spectrum disorder as mental disorders for purposes of civil commitment under ORS 426.130. *See* ORS 174.010 (providing that "the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained [in a statute], not to insert what has been omitted, or to omit what has been inserted").

Having concluded that autism spectrum disorder is not, as a matter of law, a "mental disorder" for purposes of ORS 426.005(1)(f) and ORS 426.130, we turn to whether there was sufficient evidence in the record to support the trial court's finding that appellant was a person with mental illness. At the commitment hearing, the evidence was that appellant's only diagnosis was autism spectrum disorder. Because autism spectrum disorder does not qualify as a mental disorder for purposes of a civil commitment under ORS 426.130, there was not sufficient evidence in the record

to support the trial court's determination that appellant was a person with mental illness. Accordingly, the trial court erred in finding that appellant was a person with a mental illness.

Reversed.