354                    April 2, 2025                    No. 274

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of J. B.,
a Person Alleged to have Mental Illness.
STATE OF OREGON,
*Respondent,*

*v.*

J. B.,
*Appellant.*

Clackamas County Circuit Court
24CC00615; A183528

Cody M. Weston, Judge.

Submitted December 19, 2024.

Liza Langford filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Jona J. Maukonen, Assistant Attorney General, filed the brief for respondent.

Before Aoyagi, Presiding Judge, Egan, Judge, and Joyce, Judge.

AOYAGI, P. J.

Affirmed.

## AOYAGI, P. J.

Appellant appeals a judgment of civil commitment. The trial court found appellant to be unable to meet her basic needs due to a mental disorder, specifically neurocognitive disorder with behavioral disturbances. Appellant contends that the trial court erred, because her condition does not qualify as a "mental disorder" for civil commitment purposes. The state responds that, regardless of whether neurocognitive disorder alone would qualify, appellant's condition qualifies because of the associated behavioral disturbances. For the reasons explained below, we affirm.

### FACTS

We state the facts "consistently with the trial court's express and implied findings" from the commitment hearing on February 2, 2024.[1] *State v. B. B.*, 240 Or App 75, 77, 245 P3d 697 (2010) (internal quotation marks and citations omitted). In this case, those findings were based on the testimony of appellant and four other witnesses: Dr. Ronald Spangler, a psychiatrist who had treated appellant in the hospital for three days; Don Glenn, an adult protective services specialist with Department of Human Services; Paige Cordell, the mental health investigator; and Al Belais, the mental health examiner.

Appellant is an 81-year-old woman. She suffers from a number of medical conditions, including acute and chronic congestive heart failure, extremity edema, hypertension, and diabetes. On January 20, 2024, appellant called 9-1-1 due to difficulty breathing. When she arrived at the hospital, she was given oxygen for her breathing and provided wound care for blisters on her legs that had been caused by warming her legs in the oven because she lacked heat in her home. In addition to her medical issues, appellant's care team had concerns about her mental health. Appellant initially scored 8 out of 30 on the Saint Louis University Mental Status (SLUMS) evaluation, with anything under 20 being evidence of cognitive impairment. She scored better when given the evaluation a second time, indicating mild to moderate cognitive impairment.

---

[1] Appellant has not requested *de novo* review under ORAP 5.40(8)(C), nor do we choose to provide it.

According to testimony at appellant's commitment hearing, the term "neurocognitive disorder" was adopted a little over a decade ago in the *Diagnostic and Statistical Manual of Mental Disorders* (5th ed 2013) (DSM-5). "Dementia" is an "older term" and is "what major neurocognitive disorder was in the DSM-IV, which is the previous edition." Neurocognitive disorder is "[e]ssentially" the same as dementia but "incorporates more things than necessarily just the term dementia." Neurocognitive disorder can be diagnosed as "major" or "mild." It also can be "with" or "without" behavioral disturbances. Examples of behavioral disturbances include psychosis, depression, and mania, which may be caused by Alzheimer's disease, vascular disease, Huntington's disease, Lewy Body dementia, or the like. Neurocognitive disorder is not curable but can be managed, and medication can help slow the progression. Whether major or mild, neurocognitive disorder is a mental health diagnosis, not a developmental or intellectual disability. It is usually "gradual and insidious" in onset.

Here, multiple witnesses agreed that appellant has neurocognitive disorder, although its severity had not yet been established. Spangler testified that his "best assessment" was that appellant's impairment is related to Alzheimer's disease, which is the "most common," but, given her improvement in the hospital, he had not yet decided whether appellant has major or mild neurocognitive disorder. Cordell testified that appellant was "probably more appropriate for major," given the severity of her adaptive functioning challenges, but was not definitive. Based on reviewing the records and interviewing appellant immediately before the hearing, Belais's "diagnostic impression" of appellant was "Moderate Neurocognitive Disorder, with behavioral disturbance, secondary to dementia as indicated by impaired cognitive functioning, evidenced by score in dementia range on [SLUMS] exam of 8/30."[2]

---

[2] Both Spangler and Cordell testified that neurocognitive disorder can be diagnosed as "major" or "mild," which is consistent with the DSM-5. *See* DSM-5 at 603, 605 (allowing for neurocognitive disorder to be diagnosed as major or mild, depending on the amount of cognitive decline). Belais's diagnosis appears to refer to major neurocognitive disorder of moderate degree. *See id*. at 605 (providing that major neurocognitive disorder may be further classified as severe,

The difficulties that appellant experiences as a result of neurocognitive disorder include difficulty with complex attention, that is, maintaining focus when more than one thing is happening in her environment; executive dysfunction, which contributes to her difficulty managing her house; learning and memory issues, such as repeatedly having the same conversation and not recalling people's names, how long ago something happened, or what she did a week earlier; speech issues, such as repetition and trouble with words; judgment deficits in social cognition; and perceptual motor issues, such as appearing to shuffle when walking. Medication can help with some of those symptoms.

Appellant's neurocognitive disorder is "with behavioral disturbances," specifically paranoia, which is a psychotic symptom.[3] Spangler described appellant's paranoia as "a general distrust and suspicion about various people," and he gave examples of appellant making potentially paranoid statements (unspecified) about a neighbor and about her daughter's partner. While hospitalized, appellant had taken a few doses of an antipsychotic medication on an as-needed basis, which were "helpful," and a consulting psychiatrist had recommended putting her on an antipsychotic.

Glenn testified to having a 45-minute conversation with appellant in the hospital, then visiting her house. Appellant acknowledged to Glenn that there were rats in the house, that there were holes in the floors (and that she had fallen into a hole at least once), that there was no working furnace, that the refrigerator and other appliances did not work, and that she did not have any fresh food and had been eating rotten food from the cabinets. In their conversation, appellant was clearly able to "identify the neglect in the home," but it was unclear that she understood the related risks. She also did not seem to recognize safe versus

---

moderate, or mild, depending on the degree of impairment to activities of daily living).

[3] In its briefing, the state describes appellant's behavioral disturbances as "including paranoia and delusions." However, after the mental health investigator described what a behavioral disturbance "can look like," she was asked specifically what it looked like "[i]n this particular instance," and she answered, "So in this particular instance, um, that would be the psychotic symptoms of paranoia." No one contradicted that testimony or provided evidence that appellant was displaying other "behavioral disturbances."

unsafe choices—such as putting on more clothes when cold, instead of putting her legs in the oven, or finding alternative shelter when the temperature dropped extremely low, instead of staying in her freezing house, or arranging for food delivery, instead of eating rotten food. When he visited the house, Glenn found overflowing rooms that lacked clear pathways, holes in the floors and ceilings, rodent droppings everywhere (including in the kitchen and appellant's bedroom), a very dirty kitchen, an empty refrigerator, and a very strong odor of urine that could have been caused by the rats or by the two cats living in the house. Given the state of the home, Glenn did not think it advisable for appellant to return home.

The trial court found appellant to be unable to meet her basic needs due to a mental disorder. Specifically, it found that she has neurocognitive disorder with behavioral disturbances, "at least" mild in severity, which caused her to be unable to meet her basic needs, particularly her need to live in a home that was physically safe.

## ANALYSIS

A person may be involuntarily committed under ORS 426.130 only if the person is determined to be a "person with mental illness." ORS 426.130(1)(a)(C). A person with mental illness includes a "person who because of a mental disorder is *** [u]nable to provide for basic personal needs that are necessary to avoid serious physical harm in the near future, and is not receiving such care as is necessary to avoid such harm." ORS 426.005(1)(f)(B). The state bears the burden of proof. ORS 426.130(1)(a). On appeal, appellant does not dispute that she cannot meet her basic needs, but she contends that the trial court erred in finding that that inability is caused by a mental disorder. She argues that Alzheimer's disease does not qualify as a "mental disorder" for purposes of ORS 426.005(1)(f). In response, the state takes no position on whether Alzheimer's disease qualifies as a mental disorder. It argues that "the trial court did not find that appellant had Alzheimer's disease" and that Alzheimer's "would not account for appellant's paranoia." In the state's view, the record supports appellant having a "broader neurocognitive disorder with behavior disturbances" that qualifies as

a mental disorder, regardless of whether Alzheimer's would qualify as a mental disorder.

In reviewing a judgment of civil commitment, we "view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *State v. M. A.*, 276 Or App 624, 625, 371 P3d 495 (2016) (internal quotation marks omitted). To the extent that questions of statutory construction arise, "the intended meaning of a statute is a question of law." *DCBS v. Muliro*, 359 Or 736, 742, 380 P3d 270 (2016). We decide such questions by examining the text, context, and legislative history of the provision at issue. *State v. Gaines*, 346 Or 160, 171-73, 206 P3d 1042 (2009); *see also Strasser v. State of Oregon*, 368 Or 238, 260, 489 P3d 1025 (2021) (recognizing that, in construing statutes, our analysis is not limited by the parties' arguments).

As a preliminary matter, we agree with the state that the relevant diagnosis for purposes of our analysis is neurocognitive disorder with behavioral disturbances, not Alzheimer's disease. We understand the evidence to be that Alzheimer's disease is the most likely cause of appellant's neurocognitive disorder, if only because it is generally the "most common" known cause, but that appellant's actual diagnosed condition is neurocognitive disorder with behavioral disturbances.

We disagree, however, with any suggestion by the state that we can focus on appellant's "behavioral disturbances" and thus avoid deciding whether neurocognitive disorder—including that caused by Alzheimer's or other dementia diseases—qualifies as a "mental disorder" for civil commitment purposes. The only behavioral disturbance that appellant was identified to have was paranoia, manifesting as "a general distrust and suspicion about various people." There was some minimal evidence that appellant's paranoia might contribute somewhat to her difficulty managing home repairs, including her self-reported negative interactions with contractors and handymen, but not to the point of supporting a commitment based on paranoia alone.

Rather, we understand the trial court to have viewed appellant's neurocognitive disorder, which causes symptoms such as executive dysfunction, as critical to its determination that appellant had a mental disorder that made her unable to meet her basic needs. Accordingly, we cannot accept the state's invitation to focus on appellant's paranoia and thus avoid deciding the question whether neurocognitive disorder is a "mental disorder" for civil commitment purposes.

Turning to that question, "mental disorder" is not defined in the civil commitment statutes, *see* ORS 426.005, so whether neurocognitive disorder qualifies as a "mental disorder" presents a question of statutory construction. We therefore begin by examining the text—which, in this case, proves to be all that we have to work with, as nothing in the statutory context sheds any light on whether the legislature intended "mental disorder" to encompass neurocognitive disorder, nor are we aware of anything useful in the legislative history on that point. *Cf. State v. Smith*, 71 Or App 205, 208, 692 P2d 120 (1984) ("Mental disorder is not defined by the statute, nor is it clarified by the legislative history of ORS 426.005."). So, the text it is.

The text is "mental disorder." When the legislature uses technical terminology from a specialized field, "we look to the meaning and usage of those terms in the discipline from which the legislature borrowed them." *Comcast Corp. v. Dept. of Rev.*, 356 Or 282, 296, 337 P3d 768 (2014). In *State v. A. B. K.*, 323 Or App 246, 249, 522 P3d 894 (2022), we recently treated "mental disorder" in ORS 426.005(1)(f) as such a term and, accordingly, looked to the DSM-5 to help understand its meaning. The DSM-5 provides:

> "A mental disorder is a syndrome characterized by clinically significant disturbance in an individual's cognition, emotion regulation, or behavior that reflects a dysfunction in the psychological, biological, or developmental processes underlying mental functioning. Mental disorders are usually associated with significant distress or disability in social, occupational, or other important activities. An expectable or culturally approved response to a common stressor or loss, such as the death of a loved one, is not a mental disorder. Socially deviant behavior (e.g., political, religious, or sexual) and conflicts that are primarily

between the individual and society are not mental disorders unless the deviance or conflict results from a dysfunction in the individual, as described above."

DSM-5 at 20.

In *A. B. K.*, we concluded that, even though autism spectrum disorder comes within the DSM-5's "broad definition" of "mental disorder," the Oregon legislature did not intend it to be considered a "mental disorder" for civil commitment purposes. 323 Or App at 253. We reached that conclusion based on "the context provided by related statutes—*viz.*, ORS chapter 427, ORS 426.701"—and prior case law interpreting them, particularly *State v. H. L. C.*, 318 Or App 449, 507 P3d 346 (2022). *Id.* In short, we concluded that the legislature had clearly signaled its intent that intellectual and developmental disabilities be addressed separately from "mental disorders" by enacting separate legislation to address people with those types of disabilities. *Id.* That led us to hold that the legislature "did not intend to treat a developmental disability such as autism spectrum disorder as a mental disorder in ORS chapter 426." *Id.*

Appellant in this case suggests that neurocognitive disorder should be treated analogously to autism spectrum disorder. She describes Alzheimer's disease as a "progressive degenerative brain disorder"; argues that the legislature did not intend to "lump in the elderly suffering with Alzheimer's with those suffering from a mental disorder"; and points to the guardianship statutes as providing an appropriate means to help people who are mentally incapacitated by Alzheimer's. *See* ORS 125.005(5) (defining "incapacitated" as "a condition in which a person's ability to receive and evaluate information effectively or to communicate decisions is impaired to such an extent that the person presently lacks the capacity to meet the essential requirements for the person's physical health or safety").

We are unpersuaded. Beginning with the guardianship issue, we agree with the trial court that, in this situation, "it's [not] one or the other." That is, nothing in the guardianship statutes suggests to us that the possibility of a guardianship was meant to preclude civil commitment. In *A. B. K.*, we viewed "the organization of ORS chapters

426 and 427" as signaling the legislature's intention to treat people with intellectual disabilities differently from people with mental illness, both generally and with respect to commitment, in that "'ORS chapter 426 applies to persons with mental illness and nowhere uses the term intellectual disability, while ORS chapter 427 applies to persons with an intellectual or developmental disability and nowhere uses the term mental illness or mental disorder,'" and in that ORS 427.290 "outlines commitment procedures for a person with an intellectual disability." 323 Or App at 252 (quoting *H. L. C.*, 318 Or App at 453).

Whereas ORS chapter 427 is specifically directed to people with intellectual disabilities, the guardianship statutes are of general application, such that they may be applied to people with neurocognitive disorders but are not specifically directed to that group of people. Eligibility for guardianship is based on impairment of "a person's ability to receive and evaluate information effectively or to communicate decisions"—a definition that applies broadly, not only to people suffering from neurocognitive disorders. ORS 125.005(5). In short, appellant's analogy does not hold; we cannot infer from the existence of the guardianship statutes that the legislature intended to exclude neurocognitive disorders from "mental disorder."

Of course, that alone does not answer the question whether neurocognitive disorder is a "mental disorder." Nor does existing case law answer that question. In *State v. C. K.*, 300 Or App 313, 314, 316, 451 P3d 243 (2019), we affirmed a judgment civilly committing a person who had both depressive disorder and "major neurocognitive disorder"; however, it was "undisputed" that the appellant had a "mental disorder," so *C. K.* is of no precedential value on that point. In *State v. S. T.*, 294 Or App 683, 684, 686, 432 P3d 378 (2018), we reversed a judgment civilly committing a person who suffered from "a form of dementia that causes delusions, behavioral changes, and personality changes"; however, we did so because the evidence was insufficient to establish an inability to meet basic needs, so *S. T.* too lacks precedential value as to the issue at hand.

Unaided by existing case law, we turn to the DSM-5 and the World Health Organization's International Classification of Diseases (ICD). *See Smith*, 71 Or App at 210 (considering the DSM-III and the ICD in addressing whether alcoholism qualifies as a "mental disorder" for civil commitment purposes); *but see also A. B. K.*, 323 Or App at 249 (recognizing that "inclusion of a particular condition in the DSM-5" is relevant but not determinative as to whether it qualifies as a mental disorder for civil commitment).

The DSM-5 describes "neurocognitive disorder" as

"the group of disorders in which the primary clinical deficit is in cognitive function, and that are acquired rather than developmental. Although cognitive deficits are present in many if not all mental disorders (e.g., schizophrenia, bipolar disorders), only disorders whose core features are cognitive are included in the [neurocognitive disorder (NCD)] category. The NCDs are those in which impaired cognition has not been present since birth or very early life, and thus represents a decline from a previously attained level of functioning."

DSM-5 at 591. The ICD similarly describes neurocognitive disorder:

"Neurocognitive disorders are characterised by primary clinical deficits in cognitive functioning that are acquired rather than developmental. That is, neurocognitive disorders do not include disorders characterised by deficits in cognitive function that are present from birth or that typically arise during the developmental period, which are classified in the grouping neurodevelopmental disorders. Rather, neurocognitive disorders represent a decline from a previously attained level of functioning. Although cognitive deficits are present in many mental disorders (e.g., schizophrenia, bipolar disorders), only disorders whose core features are cognitive are included in the neurocognitive disorders grouping. In cases where the underlying pathology and aetiology for neurocognitive disorders can be determined, the identified aetiology should be classified separately."

World Health Organization, *ICD-11 for Mortality and Morbidity Statistics*, available at https://icd.who.int/browse/2024-01/mms/en#213458094 (last accessed March 4, 2025).

The DSM-5 and ICD definitions of neurocognitive disorder are consistent with the testimony in this case, including in establishing that neurocognitive disorder is a mental health diagnosis and not a developmental or intellectual disability. They support the conclusion that neurocognitive disorder is a "mental disorder" for purposes of the civil commitment statutes. Moreover, unlike the situation in *A. B. K.*, nothing in the statutory context or in the legislative history of which we are aware suggests that the legislature intended otherwise.

Accordingly, we conclude that the trial court did not err in concluding that appellant has a "mental disorder" under ORS 426.005(1)(f)(B). Appellant does not contest that she was unable to meet her basic needs as a result of her disorder, so that conclusion resolves the only disputed issue in the case.

Affirmed.